BOND ET AL. *v.* FLOYD ET AL.

No. 87.   Argued November 10, 1966.—Decided December 5, 1966.

*Howard Moore, Jr.,* and *Leonard B. Boudin* argued the cause for appellants. With them on the briefs was *Victor Rabinowitz.*

*Arthur K. Bolton,* Attorney General of Georgia, argued the cause for appellees. With him on the brief were *William L. Harper* and *Alfred L. Evans, Jr.,* Assistant Attorneys General, and *Paul L. Hanes*, Deputy Assistant Attorney General.

Briefs of *amici curiae,* urging reversal, were filed by *Robert L. Carter* for the National Association for the Advancement of Colored People; *Melvin L. Wulf* and

*Charles Morgan, Jr.,* for the American Civil Liberties Union et al.; and by *Joseph B. Robison* for the American Jewish Congress.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The question presented in this case is whether the Georgia House of Representatives may constitutionally exclude appellant Bond, a duly elected Representative, from membership because of his statements, and statements to which he subscribed, criticizing the policy of the Federal Government in Vietnam and the operation of the Selective Service laws. An understanding of the circumstances of the litigation requires a complete presentation of the events and statements which led to this appeal.

Bond, a Negro, was elected on June 15, 1965, as the Representative to the Georgia House of Representatives from the 136th House District. Of the District's 6,500 voters, approximately 6,000 are Negroes. Bond defeated his opponent, Malcolm Dean, Dean of Men at Atlanta University, also a Negro, by a vote of 2,320 to 487.

On January 6, 1966, the Student Nonviolent Coordinating Committee, a civil rights organization of which Bond was then the Communications Director, issued the following statement on American policy in Vietnam and its relation to the work of civil rights organizations in this country:

> "The Student Nonviolent Coordinating Committee has a right and a responsibility to dissent with United States foreign policy on an issue when it sees fit. The Student Nonviolent Coordinating Committee now states its opposition to United States' involvement in Viet Nam on these grounds:

"We believe the United States government has been deceptive in its claims of concern for freedom of the Vietnamese people, just as the government has been deceptive in claiming concern for the freedom of colored people in such other countries as the Dominican Republic, the Congo, South Africa, Rhodesia and in the United States itself.

"We, the Student Nonviolent Coordinating Committee, have been involved in the black people's struggle for liberation and self-determination in this country for the past five years. Our work, particularly in the South, has taught us that the United States government has never guaranteed the freedom of oppressed citizens, and is not yet truly determined to end the rule of terror and oppression within its own borders.

"We ourselves have often been victims of violence and confinement executed by United States government officials. We recall the numerous persons who have been murdered in the South because of their efforts to secure their civil and human rights, and whose murderers have been allowed to escape penalty for their crimes.

"The murder of Samuel Young in Tuskegee, Ala., is no different than the murder of peasants in Viet Nam, for both Young and the Vietnamese sought, and are seeking, to secure the rights guaranteed them by law. In each case the United States government bears a great part of the responsibility for these deaths.

"Samuel Young was murdered because United States law is not being enforced. Vietnamese are murdered because the United States is pursuing an aggressive policy in violation of international law. The United States is no respecter of persons or law

120

when such persons or laws run counter to its needs and desires.

"We recall the indifference, suspicion and outright hostility with which our reports of violence have been met in the past by government officials.

"We know that for the most part, elections in this country, in the North as well as the South, are not free. We have seen that the 1965 Voting Rights Act and the 1964 Civil Rights Act have not yet been implemented with full federal power and sincerity.

"We question, then, the ability and even the desire of the United States government to guarantee free elections abroad. We maintain that our country's cry of 'preserve freedom in the world' is a hypocritical mask behind which it squashes liberation movements which are not bound, and refuse to be bound, by the expediencies of United States cold war policies.

"We are in sympathy with, and support, the men in this country who are unwilling to respond to a military draft which would compel them to contribute their lives to United States aggression in Viet Nam in the name of the 'freedom' we find so false in this country.

"We recoil with horror at the inconsistency of a supposedly 'free' society where responsibility to freedom is equated with the responsibility to lend oneself to military aggression. We take note of the fact that 16 per cent of the draftees from this country are Negroes called on to stifle the liberation of Viet Nam, to preserve a 'democracy' which does not exist for them at home.

"We ask, where is the draft for the freedom fight in the United States?

"We therefore encourage those Americans who prefer to use their energy in building democratic forms within this country. We believe that work in the civil rights movement and with other human relations organizations is a valid alternative to the draft. We urge all Americans to seek this alternative, knowing full well that it may cost their lives— as painfully as in Viet Nam."

On the same day that this statement was issued, Bond was interviewed by telephone by a reporter from a local radio station, and, although Bond had not participated in drafting the statement, he endorsed the statement in these words:

"Why, I endorse it, first, because I like to think of myself as a pacifist and one who opposes that war and any other war and eager and anxious to encourage people not to participate in it for any reason that they choose; and secondly, I agree with this statement because of the reason set forth in it— because I think it is sorta hypocritical for us to maintain that we are fighting for liberty in other places and we are not guaranteeing liberty to citizens inside the continental United States.

.        .        .        .        .

"Well, I think that the fact that the United States Government fights a war in Viet Nam, I don't think that I as a second class citizen of the United States have a requirement to support that war. I think my responsibility is to oppose things that I think are wrong if they are in Viet Nam or New York, or Chicago, or Atlanta, or wherever."

When the interviewer suggested that our involvement in Vietnam was because "if we do not stop Communism

there that it is just a question of where will we stop it next," Bond replied:

> "Oh, no, I'm not taking a stand against stopping World Communism, and I'm not taking a stand in favor of the Viet Cong. What I'm saying that is, first, that I don't believe in that war. That particular war. I'm against all war. I'm against that war in particular, and I don't think people ought to participate in it. Because I'm against war, I'm against the draft. I think that other countries in the World get along without a draft—England is one—and I don't see why we couldn't, too.

> .      .      .      .      .

> ". . . I'm not about to justify that war, because it's stopping International Communism, or whatever—you know, I just happen to have a basic disagreement with wars for whatever reason they are fought— . . . [F]ought to stop International Communism, to promote International Communism, or for whatever reason. I oppose the Viet Cong fighting in Viet Nam as much as I oppose the United States fighting in Viet Nam. I happen to live in the United States. If I lived in North Viet Nam I might not have the same sort of freedom of expression, but it happens that I live here—not there."

The interviewer also asked Bond if he felt he could take the oath of office required by the Georgia Constitution, and Bond responded that he saw nothing inconsistent between his statements and the oath. Bond was also asked whether he would adhere to his statements if war were declared on North Vietnam and if his statements might become treasonous. He replied that he did not know "if I'm strong enough to place myself in a position where I'd be guilty of treason."

Before January 10, 1966, when the Georgia House of Representatives was scheduled to convene, petitions challenging Bond's right to be seated were filed by 75 House members. These petitions charged that Bond's statements gave aid and comfort to the enemies of the United States and Georgia, violated the Selective Service laws, and tended to bring discredit and disrespect on the House. The petitions further contended that Bond's endorsement of the SNCC statement "is totally and completely repugnant to and inconsistent with the mandatory oath prescribed by the Constitution of Georgia for a Member of the House of Representatives to take before taking his seat." For the same reasons, the petitions asserted that Bond could not take an oath to support the Constitution of the United States. When Bond appeared at the House on January 10 to be sworn in, the clerk refused to administer the oath to him until the issues raised in the challenge petitions had been decided.

Bond filed a response to the challenge petitions in which he stated his willingness to take the oath and argued that he was not unable to do so in good faith. He further argued that the challenge against his seating had been filed to deprive him of his First Amendment rights, and that the challenge was racially motivated. A special committee was appointed to report on the challenge, and a hearing was held to determine exactly what Bond had said and the intentions with which he had said it.

At this hearing, the only testimony given against Bond was that which he himself gave the committee. Both the opponents Bond had defeated in becoming the Representative of the 136th District testified to his good character and to his loyalty to the United States. A recording of the interview which Bond had given to the reporter after the SNCC statement was played, and Bond was called to the stand for cross-examination. He there admitted his statements and elaborated his views. He

stated that he concurred in the SNCC statement "without reservation," and, when asked if he admired the courage of persons who burn their draft cards, responded:

> "I admire people who take an action, and I admire people who feel strongly enough about their convictions to take an action like that knowing the consequences that they will face, and that was my original statement when asked that question.
>
> .        ⸱        .        .        .
>
> "I have never suggested or counseled or advocated that any one other person burn their draft card. In fact, I have mine in my pocket and will produce it if you wish. I do not advocate that people should break laws. What I simply try to say was that I admired the courage of someone who could act on his convictions knowing that he faces pretty stiff consequences."

Tapes of an interview Bond had given the press after the clerk had refused to give him the oath were also heard by the special committee. In this interview, Bond stated:

> "I stand before you today charged with entering into public discussion on matters of National interest. I hesitate to offer explanations for my actions or deeds where no charge has been levied against me other than the charge that I have chosen to speak my mind and no explanation is called for, for no member of this House, has ever, to my knowledge, been called upon to explain his public statements for public postures as a prerequisite to admission to that Body. I therefore, offer to my constituents a statement of my views. I have not counselled burning draft cards, nor have I burned mine. I have suggested that congressionally outlined alternatives to military service be extended to

building democracy at home. The posture of my life for the past five years has been calculated to give Negroes the ability to participate in formulation of public policies. The fact of my election to public office does not lessen my duty or desire to express my opinions even when they differ from those held by others. As to the current controversy because of convictions that I have arrived at through examination of my conscience I have decided I personally cannot participate in war.

"I stand here with intentions to take an oath—that oath they just took in there—that will dispel any doubts about my convictions or loyalty."

The special committee gave general approval in its report to the specific charges in the challenge petitions that Bond's endorsement of the SNCC statement and his supplementary remarks showed that he "does not and will not" support the Constitutions of the United States and of Georgia, that he "adheres to the enemies of the . . . State of Georgia" contrary to the State Constitution, that he gives aid and comfort to the enemies of the United States, that his statements violated the Universal Military Training and Service Act, § 12, 62 Stat. 622, 50 U. S. C. App. § 462, and that his statements "are reprehensible and are such as tend to bring discredit to and disrespect of the House." On the same day the House adopted the committee report without findings and without further elaborating Bond's lack of qualifications, and resolved by a vote of 184 to 12 that "Bond shall not be allowed to take the oath of office as a member of the House of Representatives and that Representative-Elect Julian Bond shall not be seated as a member of the House of Representatives."

Bond then instituted an action in the District Court for the Northern District of Georgia for injunctive re-

lief and a declaratory judgment that the House action was unauthorized by the Georgia Constitution and violated Bond's rights under the First Amendment. A three-judge District Court was convened under 28 U. S. C. § 2281. All three members of the District Court held that the court had jurisdiction to decide the constitutionality of the House action because Bond had asserted substantial First Amendment rights.[1] On the merits, however, the court was divided.

Judges Bell and Morgan, writing for the majority of the court, addressed themselves first to the question of whether the Georgia House had power under state law to disqualify Bond based on its conclusion that he could not sincerely take the oath of office. They reasoned that separation-of-powers principles gave the Legislature power to insist on qualifications in addition to those specified in the State Constitution. The majority pointed out that nothing in the Georgia Constitution limits the qualifications of the legislators to those expressed in the constitution.

Having concluded that the action of the Georgia House was authorized by state law, the court considered whether Bond's disqualification violated his constitutional right of freedom of speech. It reasoned that the decisions of this Court involving particular state political offices supported an attitude of restraint in which the principles of separation of powers and federalism should be balanced against the alleged deprivation of individual constitutional rights. On this basis, the majority below fashioned the test to be applied in this case as being whether the refusal to seat Bond violated procedural or what it termed substantive due process. The court held that the hearing which had been given Bond by the House satisfied procedural due process. As for

---

[1] The opinion of the District Court is reported at 251 F. Supp. 333 (1966).

what it termed the question of substantive due process, the majority concluded that there was a rational evidentiary basis for the ruling of the House. It reasoned that Bond's right to dissent as a private citizen was limited by his decision to seek membership in the Georgia House. Moreover, the majority concluded, the SNCC statement and Bond's related remarks went beyond criticism of national policy and provided a rational basis for a conclusion that the speaker could not in good faith take an oath to support the State and Federal Constitutions:

"A citizen would not violate his oath by objecting to or criticizing this policy or even by calling it deceptive and false as the statement did.

"But the statement does not stop with this. It is a call to action based on race; a call alien to the concept of the pluralistic society which makes this nation. It aligns the organization with '. . . colored people in such other countries as the Dominican Republic, the Congo, South Africa, Rhodesia . . . .' It refers to its involvement in the black people's struggle for liberation and self-determination . . . .' It states that 'Vietnamese are murdered because the United States is pursuing an aggressive policy in violation of international law.' It alleges that Negroes, referring to American servicemen, are called on to stifle the liberation of Viet Nam.

"The call to action, and this is what we find to be a rational basis for the decision which denied Mr. Bond his seat, is that language which states that SNCC supports those men in this country who are unwilling to respond to a military draft." [2]

Chief Judge Tuttle dissented.[3] He reasoned that the question of the power of the Georgia House under the

---

[2] *Id.*, at 344.
[3] *Id.*, at 345.

State Constitution to disqualify a Representative under these circumstances had never been decided by the state courts, and that federal courts should construe state law, if possible, so as to avoid unnecessary federal constitutional issues. Since Bond satisfied all the stated qualifications in the State Constitution, Chief Judge Tuttle concluded that his disqualification was beyond the power of the House as a matter of state constitutional law.

Bond appealed directly to this Court from the decision of the District Court under 28 U. S. C. § 1253. While this appeal was pending, the Governor of Georgia called a special election to fill the vacancy caused by Bond's exclusion. Bond entered this election and won overwhelmingly. The House was in recess, but the Rules Committee held a hearing in which Bond declined to recant his earlier statements. Consequently, he was again prevented from taking the oath of office, and the seat has remained vacant. Bond again sought the seat from the 136th District in the regular 1966 election, and he won the Democratic primary in September 1966, and won an overwhelming majority in the election of November 8, 1966.[4]

The Georgia Constitution sets out a number of specific provisions dealing with the qualifications and eligibility of state legislators. These provide that Representatives shall be citizens of the United States, at least 21 years of age, citizens of Georgia for two years, and residents for one year of the counties from which elected.[5] The

---

[4] A question was raised in oral argument as to whether this case might not be moot since the session of the House which excluded Bond was no longer in existence. The State has not pressed this argument, and it could not do so, because the State has stipulated that if Bond succeeds on this appeal he will receive back salary for the term from which he was excluded.

[5] Georgia Const., Art. 3, § 6 (§ 2-1801, Ga. Code Ann.).

Georgia Constitution further provides that no one con-
victed of treason against the State, or of any crime of
moral turpitude, or of a number of other enumerated
crimes may hold any office in the State.[6]   Idiots and
insane persons are barred from office,[7] and no one hold-
ing any state or federal office is eligible for a seat in
either house.[8]   The State Constitution also provides:

> "Election, returns, etc.; disorderly conduct.—
> Each House shall be the judge of the election,
> returns, and qualifications of its members and shall
> have power to punish them for disorderly behavior,
> or misconduct, by censure, fine, imprisonment, or
> expulsion; but no member shall be expelled, except
> by a vote of two-thirds of the House to which he
> belongs." [9]

These constitute the only stated qualifications for mem-
bership in the Georgia Legislature and the State concedes
that Bond meets all of them.   The Georgia Constitution
also requires Representatives to take an oath stated in
the Constitution:

> "Oath of members.—Each senator and Repre-
> sentative, before taking his seat, shall take the
> following oath, or affirmation, to-wit: 'I will support
> the Constitution of this State and of the United
> States, and on all questions and measures which may
> come before me, I will so conduct myself, as will, in
> my judgment, be most conducive to the interests and
> prosperity of this State.' " [10]

---

[6] Georgia Const., Art. 2, § 2  (§ 2–801, Ga. Code Ann.).
[7] *Ibid.*
[8] Georgia Const., Art. 3, § 4  (§ 2–1606, Ga. Code Ann.).
[9] Georgia Const., Art. 3, § 7  (§ 2–1901, Ga. Code Ann.).
[10] Georgia Const., Art. 3, § 4  (§ 2–1605, Ga. Code Ann.).

The State points out in its brief that the latter part of this oath, involving the admonition to act in the best interests of the State, was not the standard by which Bond was judged.

The State does not claim that Bond refused to take the oath to support the Federal Constitution, a requirement imposed on state legislators by Art. VI, cl. 3, of the United States Constitution:

> "The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Tests shall ever be required as a Qualification to any Office or public Trust under the United States."

Instead, it argues that the oath provisions of the State and Federal Constitutions constitute an additional qualification. Because under state law the legislature has exclusive jurisdiction to determine whether an elected Representative meets the enumerated qualifications, it is argued that the legislature has power to look beyond the plain meaning of the oath provisions which merely require that the oaths be taken. This additional power is said to extend to determining whether a given Representative may take the oath with sincerity. The State does not claim that it should be completely free of judicial review whenever it disqualifies an elected Representative; it admits that, if a State Legislature excluded a legislator on racial or other clearly unconstitutional grounds, the federal (or state) judiciary would be justified in testing the exclusion by federal constitutional standards.[11] But the State argues that there can be no

---

[11] See *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960), in which the Court stated: "When a State exercises power wholly within the

doubt as to the constitutionality of the qualification involved in this case because it is one imposed on the State Legislatures by Article VI of the United States Constitution. Moreover, the State contends that no decision of this Court suggests that a State may not ensure the loyalty of its public servants by making the taking of an oath a qualification of office. Thus the State argues that there should be no judicial review of the legislature's power to judge whether a prospective member may conscientiously take the oath required by the State and Federal Constitutions.

We are not persuaded by the State's attempt to distinguish, for purposes of our jurisdiction, between an exclusion alleged to be on racial grounds and one alleged to violate the First Amendment. The basis for the argued distinction is that, in this case, Bond's disqualification was grounded on a constitutional standard—the requirement of taking an oath to support the Constitution. But Bond's contention is that this standard was utilized to infringe his First Amendment rights, and we cannot distinguish, for purposes of our assumption of jurisdiction, between a disqualification under an unconstitutional standard and a disqualification which, although under color of a proper standard, is alleged to violate the First Amendment.

We conclude as did the entire court below that this Court has jurisdiction to review the question of whether the action of the Georgia House of Representatives deprived Bond of federal constitutional rights, and we now move to the central question posed in the case—whether Bond's disqualification because of his statements violated

---

domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." 364 U. S., at 347.

132

the free speech provisions of the First Amendment as applied to the States through the Fourteenth Amendment.

The State argues that the exclusion does not violate the First Amendment because the State has a right, under Article VI of the United States Constitution, to insist on loyalty to the Constitution as a condition of office. A legislator of course can be required to swear to support the Constitution of the United States as a condition of holding office, but that is not the issue in this case, as the record is uncontradicted that Bond has repeatedly expressed his willingness to swear to the oaths provided for in the State and Federal Constitutions. Nor is this a case where a legislator swears to an oath *pro forma* while declaring or manifesting his disagreement with or indifference to the oath. Thus, we do not quarrel with the State's contention that the oath provisions of the United States and Georgia Constitutions do not violate the First Amendment. But this requirement does not authorize a majority of state legislators to test the sincerity with which another duly elected legislator can swear to uphold the Constitution. Such a power could be utilized to restrict the right of legislators to dissent from national or state policy or that of a majority of their colleagues under the guise of judging their loyalty to the Constitution. Certainly there can be no question but that the First Amendment protects expressions in opposition to national foreign policy in Vietnam and to the Selective Service system. The State does not contend otherwise. But it argues that Bond went beyond expressions of opposition, and counseled violations of the Selective Service laws, and that advocating violation of federal law demonstrates a lack of support for the Constitution. The State declines to argue that Bond's statements would violate any law if made by a private citizen, but it does argue that even though such

a citizen might be protected by his First Amendment rights, the State may nonetheless apply a stricter standard to its legislators. We do not agree.

Bond could not have been constitutionally convicted under 50 U. S. C. App. § 462 (a), which punishes any person who "counsels, aids, or abets another to refuse or evade registration." [12] Bond's statements were at worst unclear on the question of the means to be adopted to avoid the draft. While the SNCC statement said "We are in sympathy with, and support, the men in this country who are unwilling to respond to a military draft," this statement alone cannot be interpreted as a call to unlawful refusal to be drafted. Moreover, Bond's supplementary statements tend to resolve the opaqueness in favor of legal alternatives to the draft, and there is no evidence to the contrary. On the day the statement was issued, Bond explained that he endorsed it "because I like to think of myself as a pacifist and one who opposes that war and any other· war and eager and anxious to

---

[12] The pertinent provisions of § 462 (a) are as follows:

"[A]ny person who shall knowingly make, or be a party to the making, of any false statement or certificate regarding or bearing upon a classification or in support of any request for a particular classification, for service under the provisions of this title . . . , or rules, regulations, or directions made ·pursuant thereto, or who otherwise evades or refuses registration or service in the armed forces or any of the requirements of this title . . . , or who knowingly counsels, aids, or abets another to refuse or evade registration or service in the armed forces or any of the requirements of this title . . . , or of said rules, regulations, or directions, . . . or any person or persons who shall knowingly hinder or interfere or attempt to do so in any way, by force or violence or otherwise, with the administration of this title . . . or the rules or regulations made pursuant thereto, or who conspires to commit any one or more of such offenses, shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment . . . ."

encourage people not to participate in it for any reason that they choose." In the same interview, Bond stated categorically that he did not oppose the Vietnam policy because he favored the Communists; that he was a loyal American citizen and supported the Constitution of the United States. He further stated "I oppose the Viet Cong fighting in Viet Nam as much as I oppose the United States fighting in Viet Nam." At the hearing before the Special Committee of the Georgia House, when asked his position on persons who burned their draft cards, Bond replied that he admired the courage of persons who "feel strongly enough about their convictions to take an action like that knowing the consequences that they will face." When pressed as to whether his admiration was based on the violation of federal law, Bond stated:

> "I have never suggested or counseled or advocated that any one other person burn their draft card. In fact, I have mine in my pocket and will produce it if you wish. I do not advocate that people should break laws. What I simply try to say was that I admired the courage of someone who could act on his convictions knowing that he faces pretty stiff consequences."

Certainly this clarification does not demonstrate any incitement to violation of law. No useful purpose would be served by discussing the many decisions of this Court which establish that Bond could not have been convicted for these statements consistently with the First Amendment. See, *e. g., Wood* v. *Georgia,* 370 U. S. 375 (1962); *Yates* v. *United States,* 354 U. S. 298 (1957); *Terminiello* v. *Chicago,* 337 U. S. 1 (1949). Nor does the fact that the District Court found the SNCC statement to have racial overtones constitute a reason for holding it out-

side the protection of the First Amendment. In fact the State concedes that there is no issue of race in the case.

The State attempts to circumvent the protection the First Amendment would afford to these statements if made by a private citizen by arguing that a State is constitutionally justified in exacting a higher standard of *loyalty* from its legislators than from its citizens. Of course, a State may constitutionally require an oath to support the Constitution from its legislators which it does not require of its private citizens. But this difference in treatment does not support the exclusion of Bond, for while the State has an interest in requiring its legislators to swear to a belief in constitutional processes of government, surely the oath gives it no interest in limiting its legislators' capacity to discuss their views of local or national policy.[13] The manifest function of

---

[13] Madison and Hamilton anticipated the oppressive effect on freedom of expression which would result if the legislature could utilize its power of judging qualifications to pass judgment on a legislator's political views. At the Constitutional Convention of 1787, Madison opposed a proposal to give to Congress power to establish qualifications in general. Warren, The Making of the Constitution 420–422 (1937). The Journal of the Federal Convention of 1787 states:

"Mr. Madison was opposed to the Section as vesting an improper & dangerous power in the Legislature. The qualifications of electors and elected were fundamental articles in a Republican Govt. and ought to be fixed by the Constitution. If the Legislature could regulate those of either, it can by degrees subvert the Constitution. . . . Qualifications founded on artificial distinctions may be devised, by the stronger in order to keep out partizans of a weaker faction.

.        .        .        .        .

"Mr. Madison observed that the British Parliamt. possessed the power of regulating the qualifications both of the electors, and the elected; and the abuse they had made of it was a lesson worthy

the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy. The central commitment of the First Amendment, as summarized in the opinion of the Court in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964), is that "debate on public issues should be uninhibited, robust, and wide-open." We think the rationale of the *New York Times* case disposes of the claim that Bond's statements fell outside the range of constitutional protection. Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected. The State argues that the *New York Times* principle should not be extended to statements by a legislator because the policy of encouraging free debate about governmental operations only applies to the citizen-critic of his government. We find no support for this distinction in the *New York Times* case or in any other decision of this Court. The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than to legislators. Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates

---

of our attention. They had made the changes in both cases subservient to their own views, or to the views of political or Religious parties." 2 Farrand, The Records of the Federal Convention of 1787, pp. 249–250 (Aug. 10, 1787).

Hamilton agreed with Madison that:

"The qualifications of the persons who may choose or be chosen . . . are defined and fixed in the constitution; and are unalterable by the legislature." The Federalist, No. 60, p. 409 (Cooke ed. 1961).

by the person they have elected to represent them. We therefore hold that the disqualification of Bond from membership in the Georgia House because of his statements violated Bond's right of free expression under the First Amendment. Because of our disposition of the case on First Amendment grounds, we need not decide the other issues advanced by Bond and the *amici*.[14]

The judgment of the District Court is

*Reversed.*

---

[14] Bond argues that the action of the Georgia House was not authorized by state law, that if the State Constitution allows this exclusion it does so pursuant to an oath which is unconstitutionally vague, that the exclusion was based on statements protected by the First Amendment, and that the exclusion is a bill of attainder and an *ex post facto* law. In addition, *amicus* briefs filed in support of appellant Bond add the arguments that the decision not to seat him was inextricably involved with race prejudice and that it violated the guarantee of a republican form of government clause.

Similarly, we need not pass on the standing of two of Bond's constituents who joined in the suit below. The majority below dismissed the complaint as to these two constituents because they lacked a sufficiently direct interest in the controversy as would give them standing. The majority noted that it was appropriate to dismiss the case as to Bond's constituents because Bond's complaint would resolve every issue necessary to a decision in the case. We express no opinion on the question of whether Bond's constituents can claim that concrete adverseness which would be necessary to give them standing.