**Brian SEAMONS, Plaintiff,**

v.

**Douglas SNOW, et al., Defendants.**

**No. 1:94 NC 4 B.**

United States District Court, D.Utah, Northern Division.

Sept. 9, 1998.

**1152**

Robert Wallace, Lisa Watts Baskin, Salt Lake City, UT, David Doty, Bountiful, UT, for Plaintiff.

Dan Larsen, Barbara Ochoa, Salt Lake City, UT, for Dfendants.

## OPINION AND ORDER

BENSON, District Judge.

### I. INTRODUCTION

In the fall of 1993, Brian Seamons was a junior at Sky View High School in Smithfield, Utah, and the second-string quarterback for Sky View's football team. On Monday, October 11 of that year, five of Brian's teammates assaulted him in the locker room. As he came out of the shower after practice, Brian's teammate-assailants grabbed, forcibly restrained, and bound him to a towel rack with adhesive tape while other members of the team watched. Just as it appeared that the humiliation would go no further, one member of the team brought a girl that Brian had dated into the locker room to view him.

Outraged, on Tuesday, October 12, Brian and his parents reported this incident to police, school administrators, and other authorities, including the football coach, Douglas Snow, and the school principal, Myron Benson.

On Wednesday, October 13, Brian and his parents met with Coach Snow and Principal Benson. During that meeting, Coach Snow explained that he would support Brian's decision to pursue criminal charges against the assailants, and that he was considering some form of disciplinary action to take against the assailants. He further stated that under the circumstances as they then existed, he was not planning to remove them from the team.

Snow encouraged Brian to remain on the team. Brian agreed to consider this invitation, but said that he needed to take some time off before making his decision. By his own decision, Brian did not attend practice on Wednesday or Thursday, nor did he attend Thursday's Junior Varsity game in which he had previously been scheduled to play.

On Friday, Brian informed Coach Snow that he wanted to return to the team. Coach Snow supported Brian's decision, and invited him to eat at the traditional pre-game team-only spaghetti dinner in the school cafeteria. Shortly thereafter, before the team was scheduled to leave the school for a game against Logan High School, Coach Snow held a meeting with the four captains of the team. Coach Snow asked Brian to join the meeting.

The Coach thought it would be desirable for Brian to discuss his decision to remain with the team with the four team captains (two of whom had participated in the assault). Snow was concerned that Brian's return would create distraction on the sidelines

if contention still existed between Brian, the team captains, and the other members of the team. Snow was convinced that Brian and the team captains could resolve any contention before the game if given the opportunity to do so. This turned out not to be the case.

In the meeting, one of the captains (who had also been one of the assailants), Dan Ward, expressed his opinion that he felt Brian owed the team an apology. Earlier, the team had publicly apologized to Brian. Dan felt that Brian should have dealt with the incident internally within the team, and should not have reported the incident to the police and other public officials. Coach Snow testified that he was not in agreement with Dan's comment, and was annoyed that Dan had made it. The Coach claims that his goal was to mend feelings between Brian and his teammates.

Coach Snow expressed his feeling that Brian needed to express a willingness to "forgive and forget and apologize" before returning to the team. Brian told him that he wasn't ready to do so. Testimony of Brian Seamons, Transcript of Evidentiary Hearing held July 29, 1998 (hereinafter, Tr.) at 44 ("[Snow] asked me if I was willing to forgive and forget what had happened and I told him that I had not decided.").

At this point, Coach Snow was forced to make a decision. He could tell that the players' feelings "were not going to mend" before the game started, and was concerned about the effect that contention could have on the team that evening. He recalls that "at that moment, we had fifty-five or sixty kids on the bus waiting for us, and that is when I said, well, let's continue this on Monday, and then that is kind of where the meeting ended." Testimony of Coach Doug Snow, Tr. at 80. *See also,* Testimony of Brian Seamons, Tr. at 25 (explaining that Coach Snow said "[W]ell Brian, why don't you take the weekend to think about this.").

Brian went home and discussed the matter with his parents. Brian's parents were furious. They immediately called Principal Benson to express their disapproval of Coach Snow's decision. Brian was not expected to play as quarterback in the game against Logan High, and his participation as a player

on special teams was expected to be minimal, if at all.

Principal Benson claims that Brian's father expressed a desire to harm Coach Snow physically, stated that "he was going to come down [to the game] and 'kick [Coach Snow's] ass,'" and indicated that he would never again permit Brian to play football for Coach Snow. Deposition of Coach Doug Snow, Tr. at 81. While Brian's father admits speaking critically of Coach Snow, he denies using threatening language or withdrawing his parental consent for Brian to play football.

Principal Benson, who had been advised earlier of Brian's decision to return to the team, went directly to the game to inquire of Coach Snow what had happened, and to inform Coach Snow of Mr. Seamons' phone call. Coach Snow explained the situation to Principal Benson, informing him that Brian was going to think about his decision over the weekend. In light of all of the circumstances, including Principal Benson's report of Mr. Seamons' remark about not allowing Brian to play for Coach Snow, it is fair to say the issue of Brian's future on the Sky View High School football team was at that point unclear.

Brian attended school on Monday, but did not speak with Coach Snow until Tuesday. Brian interrupted Coach Snow in the middle of a class, and informed Snow that he "wasn't going to apologize," "didn't feel like [he] needed to apologize," and that he "was still going to play football." Deposition of Brian Seamons at 121. In Brian's words, Coach Snow responded by saying "well, then, we can't have you on the team." *Id.*

Brian's parents were "upset" and "angry" when they learned that Brian had not been allowed back on the team, and promptly reported the matter to the school board. *Id.* at 128–29. The school board responded to the entire incident, which by this point had become intensely controversial and a matter of statewide news, by canceling the remainder of the season. Later, the story took on national flavor, airing at one point on NBC's The Donahue Show.

Brian and his parents, Sherwin and Jane Seamons, filed this lawsuit in the United

States District Court for the District of Utah against Coach Snow, Principal Benson, and Lynn Nelson, individually and as employees and officers of Sky View High School and the Cache County School District. Sky View High School and the Cache County School District were also named as defendants. Plaintiffs' complaint included federal causes of action under 42 U.S.C. §§ 1983 and 1985, and Title IX (20 U.S.C. § 1681(a)).

Specifically, Brian alleged the following bases for recovery: (1) Defendants Cache County School District and Sky View High School created and tolerated a hostile educational environment in violation of Title IX, 20 U.S.C. § 1681(a); (2) Defendants were liable under 42 U.S.C. § 1983 for violating Brian's constitutional rights to procedural due process, substantive due process, freedom of association, freedom of speech, familial association, and for violating Brian's right to equal education and equal protection; (3) Sky View High School and the School District had a policy of deliberate indifference to Brian's constitutional rights in violation of § 1983; (4) Sky View High School and the School District failed adequately to train their coaches, faculty and administrators in violation of 42 U.S.C. § 1983; and (5) Defendants conspired to violate Brian's constitutional rights in violation of 42 U.S.C. § 1985. In addition, Brian sought injunctive relief, attorney's fees under 42 U.S.C. § 1988(b), and punitive damages.

This Court granted defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), finding that each of plaintiff's various claims was legally deficient under applicable federal law. 864 F.Supp. 1111 (D.Utah 1994). Plaintiff appealed. The United States Court of Appeals for the Tenth Circuit affirmed all rulings of this Court's dismissal with one exception, concluding that dismissal of Brian Seamons' First Amendment (free speech) claim was premature. 84 F.3d 1226 (10th Cir.1996). In doing so, the Court of Appeals noted the possibility that defendants could be entitled to summary judgment after discovery, and explained that defendants were not foreclosed "from reasserting their entitlement to qualified immunity on a motion for summary judgment should Brian's allega-

tions in the complaint prove to be unfounded." *Id.* at 1238.

After full discovery, including depositions of all of the principal witnesses, defendants submitted a Motion for Summary Judgment on the free speech issue, contending that there is no factual or legal support for such a claim. In considering that Motion, the Court initially held oral argument after reviewing the parties' briefs on April 21, 1998. On July 29, 1998, in an effort to obtain as clear a picture as possible of the pertinent factual setting, the Court held an evidentiary hearing at which Brian Seamons, Sherman Seamons, Coach Doug Snow, Principal Myron Benson, and Daniel Ward testified.

## II. DISCUSSION

■ It is well settled that government cannot "deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech"—even though the person has no right to the valuable governmental benefit and "even though the government may deny him the benefit for any number of reasons." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Brian argues that defendants violated the free speech clause of the First Amendment to the United States Constitution by removing him from the football team for (a) reporting the hazing incident to the police and (b) later refusing to apologize for doing so.

■ As the Supreme Court acknowledged in *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), students in the public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 509, 89 S.Ct. 733. A student's personal expression may be restricted where the forbidden conduct "in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others...." *Id.* at 513, 89 S.Ct. 733.

## A. Brian Was Not Punished for Reporting the Incident

First, Brian argues that Coach Snow and Principal Benson violated his First Amendment free speech rights by removing him from the football team in retaliation for reporting the hazing incident. In asserting this argument, he compares himself to the plaintiff in *Tinker*, claiming that school officials punished him for exercising his free speech rights.

But Brian's reliance on *Tinker* is misguided. In *Tinker*, the Supreme Court held that the Des Moines School District violated the First Amendment rights of several eighth graders when it suspended them for wearing black arm bands to school in support of a proposed Christmas truce and bombing halt in the Vietnam War. Unlike the plaintiffs in *Tinker*, Brian cannot produce sufficient facts from which a fact finder could reasonably conclude that he was denied a benefit (a position on the football team) because he exercised his First Amendment rights. In *Tinker* there was no dispute that the school district did in fact suspend the students for wearing the arm bands. By contrast, in this case Brian has failed to produce any facts that in any reasonable way show a legal causal connection between his speech and his ultimate failure to be involved with the football team.

■ In order for plaintiff to prevail, it must be shown that more than a scintilla of evidence supporting plaintiff's position exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that the "mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient). Here, there is virtually no evidence that Brian was removed from the team for reporting the hazing incident to school and law enforcement officials—not even for one game. Indeed, *all* of the evidence regarding the school officials' actions after the hazing incident became public is to the contrary. Brian himself admits that Coach Snow promised to support Brian "100 percent" if he decided to pursue criminal charges against his teammates, and that the coach expressed an unequivocal desire that Brian remain on the team. Testimony

of Brian Seamons, Tr. at 33, 35; Deposition of Brian Seamons at 45. The record demonstrates, without any reasonable evidence to the contrary, that Snow's attitude toward Brian in the aftermath of the incident was supportive and reconciliatory.

The factual record is undisputed that Coach Snow and Principal Benson made an earnest attempt to persuade Brian to return to the team after Brian himself decided to stop attending practice. *Id.* at 46–47, Deposition of Principal Myron Benson at 63–64. All of the evidence shows that Snow and Benson genuinely wanted Brian back on the team, and did what they could to make him feel comfortable with the idea. Under these circumstances, it would strain reason and logic to conclude that Snow and Benson retaliated against Brian for reporting the incident. Such a conclusion could only be based on the untenable theory that while Snow and Benson were urging Brian to return to the team, they were vengefully conspiring to rekindle his interest in football only to punish him later by removing him from the team.

The facts do not permit a jury to engage in such speculation. Accordingly, the Court concludes that Brian's claim that Snow and Benson removed him from the team for reporting the incident is unsupportable.

## B. Brian Was Not Asked to Recant

Second, Brian argues that Coach Snow violated his First Amendment free speech rights by asking Brian in the pre-game meeting to "apologize" to the team before returning to the team. Testimony of Brian Seamons, Tr. at 44. He claims that Snow's actions were part of an unconstitutional attempt to compel him to recant his previous statements, then punish him for refusing to do so.

In presenting this argument, Brian relies exclusively on the Supreme Court's analysis in *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). In *Bond*, the Court declared unconstitutional the Georgia House of Representatives' refusal to seat a properly elected legislator who refused to recant his public criticism of the United States for its participation in the Vietnam War. The Court

explained that by requiring him to recant his controversial political statements, the legislature "violated Bond's right of free expression under the First Amendment." *Id.* at 137, 87 S.Ct. 339. In part, the Court based its holding on the time-honored notion that "Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed on them, and be better able to assess their qualifications for office." *Id.* at 136–37, 87 S.Ct. 339.

■ But this case is significantly different than *Bond.* No reasonable construction of the record in this case, including evidence presented at the Court's specially convened evidentiary hearing, supports the conclusion that Brian was asked to recant his public remarks. The word "recant" means "to withdraw one's former statement or belief etc., formally rejecting it as wrong or heretical." *Id.* Oxford American Dictionary, Oxford University Press (1980). No reasonable interpretation of the testimony provided by Brian, Coach Snow, Principal Benson, and Dan Ward, or any of the other witnesses, could reasonably support a conclusion that Brian was asked to "withdraw [his] former statement[s]" about the hazing incident or "formally reject [those statements] as wrong or heretical."

### 1. Brian's Account of the Meeting

Brian's account of the meeting can be divided into roughly four phases. In the first phase, Coach Snow "introduced the meeting" and "talked about how he wanted to mend feelings and kind of get this behind us." Testimony of Brian Seamons, Tr. at 24. Snow then turned the meeting over to Brian and the team captains, instructing them to resolve their differences.

In the second phase of Brian's account of the meeting, Dan Ward expressed his feeling that Brian had "'betrayed'" the team by reporting the hazing incident to school administrators and the police. *Id.* Ward concluded by explaining that "'we would expect an apology from you before we would like you to play with us.'" *Id.*

In the third phase, Brian explained that "I didn't think that I needed to apologize and

that I wouldn't apologize." *Id.* at 25. At that point, the meeting quickly developed into a "heated discussion." *Id.*

Brian claims that during the fourth and final phase of the meeting, Coach Snow stepped in and told Brian, "'[w]e would like to get the team back together, things back the way they were before this all happened. You need to forgive and forget and apologize before you can be allowed to be on the team.'" *Id.* at 50. When Brian indicated that he was not willing to "forgive and forget and apologize" Coach Snow responded by saying "'why don't you take the weekend to think about it.'" *Id.*

### 2. Coach Snow's Account of the Meeting

Coach Snow claims that he never asked Brian to apologize. Testimony of Coach Doug Snow, Tr. at 80. In fact, Snow claims to have told the team captains that Dan Ward's request for an apology was "inappropriate." *Id.* at 78.

Snow claims that he had two reasons for asking Brian to "take the weekend to think [the situation] over." First, Snow wanted to give Brian the chance to salvage his long-standing friendship with his teammates. *Id.* at 80–81 ("Well, [I wanted to allow Brian to] consider [the] lifelong friendship he had with these young men and obviously either way you go it is going to have ramifications on that friendship which in my opinion is a heck of a lot more important than football.")

Second, the team was running late in departing for the game. Snow wanted to resolve the dispute before Brian returned to the team, but he "could tell that [the players' feelings] were not going to mend" before the game. Accordingly, Snow decided to postpone the discussion until the following Monday. *Id.* at 80, 81 ("I had sixty kids on the bus and we were late and I couldn't continue this conversation and we had to go.").

### 3. Dan Ward's Account of the Meeting

Dan Ward admits asking Brian to apologize. He claims he wanted Brian to apologize to the team because he "felt that perhaps [Brian] should have kept whatever

problems he had within the team and within the coaches and other members of the team." Testimony of Dan Ward, Tr. at 65.

Ward claims that Coach Snow never asked Brian to apologize. In fact, Ward maintains that Snow went out of his way to distance himself from Ward's request for an apology. According to Ward, after Ward had asked Brian to apologize, Coach Snow interrupted the conversation and said " 'well, I don't really think that is necessary.' " *Id.* at 66.

Ward also claims the overall tone of the meeting was far more reconciliatory than punitive. In fact, he remembers the meeting ending on an "upbeat note"—"I felt that things would be back to normal on Monday. I just thought things were on their way to being reconciled." *Id.* at 67.

### 4. The Facts Show That Snow Wanted the Players to Resolve their Differences

Even when read in the light most favorable to Brian's case, no reasonable construction of the evidence shows that in asking Brian to "forgive and forget and apologize," Coach Snow was attempting to compel Brian to recant his earlier statements about the hazing incident. Under the totality of the circumstances, the facts support only one reasonable construction: that Coach Snow wanted to resolve the contention that existed between Brian and his teammates before Brian rejoined the team that evening.

Brian admits that Coach Snow called the meeting to "talk about how he wanted to mend feelings and kind of get this behind us." *See* Testimony of Brian Seamons, Tr. at 24; Deposition of Brian Seamons at 83–87. Brian also acknowledges that he understood Coach Snow's request as an attempt to help the players "to mend feelings," and "put this incident behind the team so that [they] could go forward and be a football team." *Id.* at 47, 54. *See also,* Testimony of Brian Seamons, Tr. at 44; Exhibit "D," Reply Memorandum in Support of Defendants' Motion for Summary Judgment.

Prior to the meeting, Snow had expressed concern that hostility between Brian and his teammates could impair the players' capacity to perform as a team, and even create a potential concern for Brian's physical safety. Testimony of Brian Seamons, Tr. at 32. It is therefore not surprising that when Brian indicated (only moments before the team was scheduled to leave for the game) that he wasn't ready to mend feelings, Coach Snow began to question the wisdom in allowing him to travel with the team that night.

The facts show without reasonable dispute that Coach Snow's decision to have Brian "sit out" Friday's game was a practical one, based on his experience as a coach and his observation that "the conversation between the players . . . was not going anywhere and the feelings were still hostile and we were late and I had kids waiting on the bus and so I just put things on hold until Monday." Testimony of Coach Doug Snow, Tr. at 88.

More importantly, no reasonable construction of the facts show that Coach Snow's decision had anything to do with Brian's exercise of his free speech rights. Asking Brian to "sit out" Friday's game was not retaliatory—it was precautionary, to allow feelings to subside and mend.

While reasonable minds could differ on whether Snow's decision that evening was advisable or even necessary, they could not differ in concluding that the request did not amount to a demand that Brian recant his statements to the police, or even a suggestion that he acknowledge any wrongdoing. Rather, it can only be understood as a request for Brian to "mend feelings" with the team captains before returning to the team. The request for an "apology" was not a demand, or a request, for Brian to say he was wrong for reporting the hazing incident; it was rather a request for a mutual reconciliation among Brian and his teammates to allow the boys to function together as friends and teammates. There is simply no evidence that would permit a conclusion that the requested "apology" required Brian to say he was wrong in any of his actions, or that he was being asked to recall or recant his former speech. As much as Brian may have disliked the Coach's request, it did not offend his First Amendment rights.

## C. Brian's First Amendment Claims are Otherwise Without Merit

■ Even if the Court were to indulge the fiction that requiring Brian to "mend feelings" with his teammates before returning to the team amounted to a limitation of his free speech rights, Brian cannot prevail under the facts of this case. The facts show that Coach Snow's decision not to allow Brian to attend Friday night's game was reasonable under the circumstances. It was reasonable for Coach Snow to feel that allowing Brian to be with the team on the evening in question would have "materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the [football team]." Snow's actions were permissible because they were necessary to prevent "material[ ] disrupt[ion]" and "substantial disorder" on the football team. *Tinker*, 393 U .S. at 509, 513, 89 S.Ct. 733.

■ This conclusion and the constitutional implications of this case appear appropriate when viewed in the context of the law governing the First Amendment rights of government employees. Obviously, this case does not involve the speech of a government employee. But for purposes of the First Amendment, Brian's position on the football team is comparable to the government employment context, certainly as much as it is comparable to the academic setting at issue in *Tinker* and its progeny. And in that context, the Court, as opposed to the jury, is empowered to decide the mixed question of fact and law whether a limitation on a plaintiff's free speech rights was reasonable in light of legitimate concerns of the employer. In this case, of course, the football coach would be compared to the government employer, and it appears clear to this Court that the decision to wait until after the weekend to continue the dialogue between team members was reasonable.

To illustrate, this case can be analogized to *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), where the Supreme Court held that a district attorney did not violate the First Amendment when he fired an employee for disrupting morale and harmony within the district attorney's office—even though the disruption was argu-

ably the natural outgrowth of the employee's exercise of her free speech rights. While it may be uncommon to analogize assistant district attorneys to high school football teammates, they have at least one thing in common—they rely on "the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684 (quoting *Pickering v. Board of Education*, 391 U.S. 563, 570, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Close working relationships are especially important on a high school football team where harmony is essential—not only for "proper functioning," but for the players' safety. Again, this mixed question of fact and law is, under *Pickering* and its progeny, for the Court to decide.

■ Because Brian's stated refusal on Friday evening to mend feelings with his teammates threatened to disrupt team unity, Snow's decision not to let him play in Friday's game must be given "a wide degree of deference." *Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684; *Pickering*, 391 U.S. at 570, 88 S.Ct. 1731. The First Amendment did not forbid Snow from taking such action, nor did it require him "to allow events to unfold to the extent that [actual harm resulted] before taking action." *Connick*, 461 U.S. at 153, 103 S.Ct. 1684.

## D. Defendants Are Entitled to Qualified Immunity

■ Even if the Court were otherwise inclined to find that the defendants violated the First Amendment, they would still be entitled to qualified immunity. The doctrine of qualified immunity generally shields government officials performing discretionary functions from civil liability when their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known. *U.S. v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ The law is clearly established "when it is well developed enough to inform the reasonable official that his conduct vio-

lates that law." *Id.* In determining whether the law involved was clearly established, courts examine the law as it was at the time of the defendants' actions. *Hilliard v. City and County of Denver*, 930 F.2d 1516, 1518 (10th Cir.), *cert. denied*, 502 U.S. 1013, 112 S.Ct. 656, 116 L.Ed.2d 748 (1991). "[T]he plaintiff need not show that the specific action at issue has previously been held unlawful," he need only show that the alleged unlawfulness was apparent in light of preexisting law. *Id.* "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir.1992).

Under any reasonable construction of the facts of this case, it is not possible to conclude that reasonable officials in defendants' shoes would (or should) have known, that their actions violated Brian's free speech rights. To be sure, it is true that "a reasonably competent public official should know the law governing his conduct." *Chapman v. Nichols*, 989 F.2d 393, 397 (10th Cir.1993). And it is well-settled that where there had been well-established law in the decisions of the Tenth Circuit or the Supreme Court in October of 1993 then defendants would be deemed to be on notice of that law. For example, the *Tinker* case clearly put school officials on notice that students could not be suspended or otherwise retaliated against for exercising their free speech rights. In that context, this Court agrees that the defendants would not be entitled to qualified immunity here if there were sufficient facts produced by the plaintiff to support his claim that the defendants took such improper action against the plaintiff.

But here, as explained in detail in the previous section of the opinion, Brian has failed to show any law sufficiently well established in 1993 to support the proposition that a football coach or school principal under any reasonable interpretation of the circumstances of this case would, or should, have known that their decisions regarding Brian constituted a deprivation of Brian's free speech rights. Again, opinions may vary as to the propriety of the actions and decisions of the football coach, the principal, and many other people in this unfortunate situation, but there is no valid legal or factual foundation for the plaintiff's claim that what the defendants did was violative of clearly established law regarding the First Amendment. No reasonable jury could so conclude. Accordingly, pursuant to *U.S. v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), the defendants are entitled to qualified immunity, both as a matter of law and as a matter of fact.

## III. CONCLUSION

In conclusion, the facts do not show that anyone punished Brian for speaking out about the hazing incident or for refusing to recant his prior statements. If it were that kind of case—one where the facts supported an inference that defendants retaliated against Brian for exercising his First Amendment rights—defendants would not be entitled to qualified immunity, nor would they be entitled to summary judgment. But such a case is not before the Court.

All constitutional questions, regardless of how nobly they may be presented, ultimately rest upon the facts giving rise to the controversy. Here, all factual details have been thoroughly explored in discovery, and before the Court, and the best case that can be fashioned well-after-the-fact is a legal theory based upon speculation and unsupported innuendo. As this Court observed in its earlier opinion in this case, the hazing incident appears to have been repugnant and wrong. From that incident stemmed a torrent of controversy and hard feelings that had a significant impact on a small Northern Utah community.

Given the depth of feelings on all sides of this controversial episode, it is understandable that Brian Seamons and his parents would seek all appropriate legal redress, including raising federal statutory and constitutional issues in this United States District Court. There is, however, upon careful examination of the law and the facts, simply no constitutional structural support to allow this case to go to a jury. This case appears to

give rise to valid assertions of violations of state criminal law (assault and battery), perhaps state civil tort law, and of course public policy issues concerning the proper governance and administration of a public high school and the local school board. Those are all legitimate matters for discussion and debate in a variety of venues, including courts, where legally appropriate. But this incident, no matter how it is analyzed, does not give rise to a jury issue on freedom of speech.

Defendants' Motion for Summary Judgment is GRANTED.