United States Court of Appeals,

Eleventh Circuit.

No. 95-8230.

Walker L. CHANDLER;  Sharon T. Harris;  James D. Walker, Plaintiffs-Appellants,

v.

Zell D. MILLER, Governor;  Max Cleland, Secretary of State of Georgia;  James G. Ledbetter, Commissioner, Department of Human Resources, State of Georgia, Defendants-Appellees.

Jan. 22, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:94-cv-1298-ODE), Orinda D. Evans, Judge.

Before EDMONDSON, DUBINA and BARKETT, Circuit Judges.

EDMONDSON, Circuit Judge:

This case requires us to determine the constitutionality of a Georgia statute requiring drug testing of political candidates and nominees for state offices.  We hold that Georgia's rule violates no federal constitutional provision and affirm the district court's judgment.

I.

In 1990, the Georgia legislature enacted O.C.G.A. § 21-2-140.[1] The offices to which the statute applies include, among others, those of the Governor, Lieutenant Governor, Secretary of State,

---

[1]O.C.G.A. § 21-2-140 provides:

> At the time a candidate for state office qualifies for nomination or election, each such candidate shall file a certificate ... stating that such candidate has been tested for illegal drugs ... and that the results of such test are negative....  No candidate shall be allowed to qualify for nomination or election to a state office unless he or she presents such certificate....

Attorney General, the heads of several agencies, all state judges in courts of general jurisdiction, and all state legislators. *Id.* § 21-2-140(a)(4). Plaintiff-appellants are members of the Libertarian Party seeking the offices of Lieutenant Governor, Commissioner of Agriculture, and member of the House of Representatives.

As the language quoted in the margin indicates, anyone who declines to take the test, or who tests positive, is basically barred from holding office. Additional aspects of the drug-testing scheme were outlined by the district court: testing may, at the option of the candidate, be performed either at an approved medical testing laboratory or at the office of the candidate's physician. Laboratory procedures concerning privacy follow the Mandatory Guidelines for Federal Workplace Drug Testing Programs, set out at 53 Fed.Reg. 11,979 (1988). The test is designed to reveal the presence or absence of the indicia of five illegal drugs. No information unrelated to drug use is contemplated by the statute; the test simply indicates that the candidate tested positive or negative.

The appellants' arguments comprise three identifiable claims.[2] First, appellants argue the tests violate the Fourth Amendment prohibition on unreasonable searches and seizures. Second,

---

[2]Appellants' brief refers to almost every right enumerated in the Constitution. Many of these textual provisions are touched on only in passing, with no citations of authority. The district court focused exclusively on appellants' Fourth Amendment claim, and Appellants asserted at argument here that they chiefly advanced their First and Fourteenth Amendment claims. We regard all federal constitutional arguments except these (First, Fourth, and Fourteenth Amendments) as either abandoned or without merit.

appellants categorize the statute as affecting the Fourteenth Amendment rights of candidates to run and of voters to choose them. Third, they categorize their refusal to submit to the test as a protected speech act that cannot, under the First Amendment, be the basis for barring a candidate from the ballot.

## II.

That the tests at issue are searches within the meaning of the Fourth Amendment seems settled. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989). Like the test at issue in *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), this test "is not designed to serve the ordinary needs of law enforcement." 489 U.S. at 666, 109 S.Ct. at 1391. That is, the test is not designed to prosecute crime: no party before us contends otherwise. Special needs are involved. In this circumstance, the courts must "balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." 489 U.S. at 665-66, 109 S.Ct. at 1390-91. Another federal appeals court considering suspicionless drug testing has noted that "*Von Raab* 's balancing test is inherently, and doubtless intentionally, imprecise. The Court did not purport to list all of the factors that should be weighed or to identify which factors should be considered more weighty than others." *Willner v. Thornburgh,* 928 F.2d 1185, 1187 (D.C.Cir.1991).

No federal court seems to have entertained a Fourth Amendment

challenge to a state law requiring testing of candidates for high state office.  Thus we observe at the outset the special concerns affecting the *Von Raab* balancing test where the state's interest is in setting qualifications for its own officers.

American history is especially important in a case like this one;  and the Supreme Court observed nearly a century ago:

> It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers ... should be exclusive and free from external interference, except so far as plainly provided by the Constitution of the United States.

*Taylor v. Beckham,* 178 U.S. 548, 570-71, 20 S.Ct. 890, 898, 44 L.Ed. 1187 (1900);  (cited in *Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991)).  In the light of this command, we regard the states as entitled to considerable deference in the characterization of their own interests.

Under the *Skinner-Von Raab* framework, the state's interest is calculated mainly by reference to two factors:  the level of documented evidence of a past problem and the fundamental inconsistency of drug use with the demands of the position.  In *Skinner,* the Court approved suspicionless drug testing where there was a documented showing of widespread substance abuse among employees in the position to be subjected to testing.  489 U.S. at 607, 109 S.Ct. at 1407-08.

In *Von Raab,* the Customs office did not demonstrate a past of drug abuse among the employees to be tested.  The Court approved the search anyway, however, when confronted with evidence that physical and ethical demands on customs agents were so great as to render drug use totally incompatible with the nature of the

position.  489 U.S. at 669-70, 109 S.Ct. at 1393.  Thus, because Georgia has not argued that her elected officials have in the past abused drugs, the issue on Georgia's interest is whether unlawful drug use is similarly fundamentally incompatible with high state office.

We think that to ask this question is also to answer it.  The people of Georgia place in the trust of their elected officials that which people value most highly:  their liberty, their safety, their economic well-being, ultimate responsibility for law enforcement, and so on.  The Supreme Court has recognized that "drug abuse is one of the most serious problems confronting our society today," *Von Raab,* 489 U.S. at 674, 109 S.Ct. at 1395, and therefore has approved the drug testing of Customs officers in part because "the national interest [in eradicating drug use] could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics."  489 U.S. at 670, 109 S.Ct. at 1393.  That said, it follows, even more forcefully, that those vested with the highest executive authority to make public policy in general and frequently to supervise Georgia's drug interdiction efforts in particular must be persons appreciative of the perils of drug use.[3]

---

[3]The *Von Raab* situation might be distinguished on the basis that Congress can define the Customs Department's mission and demand sympathy to that mission as a condition of employment, whereas the executive officers here are members of a branch coequal to the Georgia legislature.  We regard this distinction as involving a pure question of state law.

Appellants asserted in their complaint that the testing violates the Georgia Constitution, but the district court decided no issues of state law.  28 U.S.C. § 1367 provides that the district courts "may decline to exercise

But drug use poses significant dangers beyond rendering elected officials unsympathetic to drug interdiction efforts. The nature of high public office in itself demands the highest levels of honesty, clear-sightedness, and clear-thinking. For example, the Lieutenant Governor is the President of the Senate and has other executive duties posed by law; more important, though, the Lieutenant Governor is to replace the Governor should the top executive office become vacant. O.C.G.A. § 45-12-7. The Governor must respond to state emergencies, *id.* § 45-12-30, and if necessary call out the state militia. *Id.* §§ 45-12-27; 45-12-28. He can direct state law enforcement agencies. *See* O.C.G.A. §§ 35-3-8.1; 35-2-33(b). The Governor has broad powers of appointment to important offices, boards, commissions, and so forth. *See generally id.* § 45-12-50; *see also* Ga. Const. Art. I, § 2, par. 1 (Governor appoints members of State Board of Pardons and Paroles). It goes without saying that clear judgment is imperative to the position. Likewise, members of the House of Representatives enact laws of general applicability for the state, while the Commissioner

---

supplemental jurisdiction over a claim" which they otherwise have power to hear if "the claim raises a novel or complex issue of state law...." *Id.* The decision not to exercise supplemental jurisdiction is reviewed for abuse of discretion. *Faucher v. Rodziewicz,* 891 F.2d 864, 872 (11th Cir.1990). In view of the complex state constitutional issues presented here and the interests of comity in this sensitive area of federal-state relations, we cannot conclude the district court abused its discretion. *See, e.g., Grant v. Seminole County, Fla.,* 817 F.2d 731, 732 (11th Cir.1987) (finding no abuse of discretion where district court failed to explain dismissal of state claim, because "[e]xercising pendent jurisdiction over the claim would have required the district court to decide a novel question of state law ..."). We also decline to decide the issues of state law raised by appellants.

of Agriculture leads an agency with broad regulatory powers.  *See generally id.* § 2-2-7 (Commissioner of Agriculture);  Ga. Const. Art. III (House of Representatives).    The positions are particularly susceptible to the "risks of bribery and blackmail against which the Government is entitled to guard." *Von Raab,* 489 U.S. at 674, 109 S.Ct. at 1395.  Simply put, the state's interest in filling these positions with drug-free people is great.[4]

Also, we note that our conclusion is strengthened by our deferential reading of Georgia's appraisal of its own interests. Evaluating the governmental interest is necessarily a policy-based inquiry;  and while the importance of electing officials whose probity and judgment are unclouded by the use of unlawful drugs may be self-evident to us, we—whatever our own views might be—would be slow to disregard Georgia's appraisal of that need in the light of cases like *Taylor, supra,* reminding us that a state's sovereign interests are at stake.

Against Georgia's interests must be balanced plaintiff-appellants' privacy interests.  The Supreme Court in *Skinner,* 489 U.S. at 626, 109 S.Ct. at 1418, noted that drug tests

---

[4]Appellants contend that because the test is administered after substantial notice, drug users may simply discontinue their indulgence for a brief period before testing and, thus, defeat the purpose of the test.  They say the testing is just ineffective.  But, in balancing the Fourth Amendment interests, there is no requirement that a search be the single most effective one a legislature could design.  Also, as the Supreme Court noted in *Von Raab,* "addicts may be unable to abstain for even a limited period of time, or may be unaware of the "fade-away effect' of certain drugs."  489 U.S. at 676, 109 S.Ct. at 1396 (citations omitted).  Persons who would be caught by Georgia's limited testing would seem to be people who are out of control about drugs;  these worst cases might be the most dangerous in public office.  The testing is not so ineffective as to be unreasonable or irrational in itself.

"require employees to perform an excretory function traditionally shielded by great privacy," and Justice Scalia wrote in *Von Raab* that the drug tests there were "particularly destructive of privacy and offensive to personal dignity." 489 U.S. at 680, 109 S.Ct. at 1398 (Scalia, J., dissenting).

But, we think that the intrusion here is even less than that approved in *Von Raab.* Here, the test can be taken at the office of the candidate's physician, whereas in *Von Raab,* the test had to be taken in the company of an (auditory) observer employed by an "independent contractor." Other aspects bearing on the individual's interests are similar to those approved in *Von Raab.* The district court noted that federally-approved privacy guidelines, such as those at 53 Fed.Reg. 11,979 *et seq.* (1988), serve as the benchmark for laboratory procedures. The test reveals only the presence or absence of the indicia of the use of illegal drugs. The results are not made available to law enforcement officers in the event a candidate chooses not to file them (if taken through one's own physician, no state agent need know that the test was administered). And, much like the Customs agents whose privacy expectations are diminished because physical conditioning and ethical behavior are central to job performance, *see Von Raab,* 489 U.S. at 679, 109 S.Ct. at 1398, candidates for high office must expect the voters to demand some disclosures about their physical, emotional, and mental fitness for the position.

Because the governmental interests of the state of Georgia outweigh the intrusions on privacy effected by the challenged testing, we hold that O.C.G.A. § 21-2-140, as applied to the

appellants, does not violate the Fourth Amendment.

                                    III.

Appellants also contend that by barring from the ballot a class of persons (those who refuse to take drug tests), the Georgia legislature has violated the rights of the candidates to run for office and the people to vote for whom they please.  In their briefs and at argument, appellants indicated they would characterize the Fourteenth Amendment as creating a nearly absolute barrier to excluding a defined group of persons from the ballot. The Supreme Court, however, has rejected that argument, most recently in *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).  There, the Court recognized Missouri's prerogative to exclude from the ballot most candidates for the state judiciary over a mandatory retirement age of seventy years. The Court acknowledged that when states bar a class of candidates from the ballot, "the Equal Protection Clause provides a check on such state authority," but cited Article IV, section 4 and the Tenth Amendment for the proposition that

> our scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives.  This rule is no more than a recognition of a State's constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders.

501 U.S. at 462, 111 S.Ct. at 2402 (citations and internal quotation marks omitted).

*Gregory* guides us in our disposition of the appellants' equal protection claim.  There, the Court held that rational basis scrutiny applies to state electoral qualifications not involving a

suspect classification.  501 U.S. at 470, 111 S.Ct. at 2406.  Under rational basis scrutiny, courts "will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979).

Considering the importance of the mental, emotional, and physical health of high public officials, we cannot conclude that the Georgia legislature acted irrationally.  Also, the Georgia statute creates less of a barrier than the one upheld in *Gregory:* whereas Missouri judicial candidates past the mandatory retirement age were permanently barred from the ballot, Georgia candidates are only barred so long as they cannot (or will not) demonstrate that they are drug-free.  Thus we hold that O.C.G.A. § 21-2-140 does not improperly infringe on the rights of people to run and of voters to choose the candidate of their choice.

IV.

Appellants' First Amendment claim is based on their assertion that the "refusal tamely to submit to the government's drug testing edict is itself a protected free speech act similar in nature to refusing to salute a flag or the king's hat set upon a post in the village square."  We read this argument as an appeal to the rationale of cases like *Communist Party of Indiana v. Whitcomb,* 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974), which invalidated a state statute conditioning ballot access on the filing of an affidavit disavowing the overthrow of state and national

governments, and *Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), which held that exclusion of a member of the Georgia House of Representatives based on his stated opposition to the Vietnam war violated the First Amendment. We think these cases are distinguishable in that they involve pure speech acts, divorced from unlawful conduct.

In that respect, this case is more like *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), where the court upheld against a First Amendment challenge the prosecution of a young man who burned his draft card, ostensibly in an effort to persuade others to oppose the Vietnam War. There, the Court stated, "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea." 391 U.S. at 376, 88 S.Ct. at 1678. The Court went on, however, to entertain the "assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment." *Id.* Against this backdrop, the Court held that government regulation of conduct containing "speech and nonspeech" elements is "sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377, 88 S.Ct. at 1679.

Georgia's drug-testing statute passes muster under the

framework of *O'Brien.* First, it is generally within the power of the state of Georgia to prescribe qualifications for its elected officials. *See Gregory,* 501 U.S. at 463, 111 S.Ct. at 2402.

Second, the statute furthers a substantial governmental interest, as described in the Fourth Amendment analysis above.

Third, the government's purpose is not suppression of free expression. The purpose, as we concluded above, is ensuring that high public officials to whom immense responsibilities are entrusted possess the judgment, probity, and alertness required of them. Anyway, it is doubtful whether the statute has even the effect, let alone purpose, of restricting speech rights. We think an audience would much more clearly perceive the intended message of one who burns a draft card than the message of one who declines to take a drug test. *See generally Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 294, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (noting that First Amendment protection of conduct depends on whether conduct "would reasonably be understood by the viewer to be communicative").

Fourth, the regulation is no more restrictive of expression than is necessary. If Georgia's goal is to preclude the nomination or election of people addicted to drugs then it must require, rather than simply advise, that prospective candidates submit to testing. Appellants have not suggested a less restrictive way for Georgia to accomplish its stated objective of keeping drug users out of office. Therefore, we conclude that whatever impact the Georgia statute has on speech does not violate the First Amendment.

V.

No party contends in this appeal that the drug testing in this case is for normal law enforcement.  The controversy is about Georgia's rights and the special need Georgia believes it has to take a step to deter illicit drug users from filling important state offices.  Especially in the light of federalism and the Tenth Amendment, we are cautious in interfering with the states on matters central to their governance.[5]  O.C.G.A. § 21-2-140 does not violate the First, Fourth, or Fourteenth Amendment rights of candidates for high office in Georgia;  we affirm the judgment of the district court.[6]

AFFIRMED.

BARKETT, Circuit Judge, dissenting:

As the majority recognizes, there is no question that the mandatory drug testing in this case is an unreasonable search

---

[5]By the way, Georgia publishes almost no official legislative history.  And, we do not accept an academic law journal's summary of a post-enactment telephone interview (not conducted under oath) with a single legislator (even one of the sponsors of a bill) as competent legislative history.  *See, e.g., Blanchette v. Connecticut General Ins. Corp.,* 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974) (rejecting use of "subsequent legislative history" because "[P]ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent....  Such statements represent only the personal views of these legislators.").  Nor do we—on the basis of such "history"—accept that Georgia's drug testing law is merely or chiefly symbolic, although that which is symbolic may still have great significance.  In their brief, plaintiff-appellants cited to no such law review summaries;  and we think they—given the lack of true legislative history available—were right not to do so.

[6]We are aware that qualifying to run for the pertinent public offices is only a few months away.  We also recognize that plaintiff-appellants will likely seek review of our decision.  For that reason, we have tried to be expeditious in announcing the decision.  Because speed seems important, we have perhaps not said all that we could—especially about history;  but we think we have said enough to indicate our general point of view.

prohibited by the Fourth Amendment *unless* it is required by "special governmental needs beyond the normal need for law enforcement," *and* those needs outweigh the candidates' privacy interests. *National Treasury Employees v. Von Raab,* 489 U.S. 656, 665-66, 109 S.Ct. 1384, 1390-91, 103 L.Ed.2d 685 (1989) (citing *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 1413-14 (1989)).  I dissent because I do not believe that the suspicionless search in these circumstances serves any special governmental need beyond the normal need for law enforcement, and, if it did, I believe that the candidates' privacy interests outweigh the governmental interests when the factors of *Von Raab* are properly considered.

Before balancing the candidates' privacy expectations against the government's interests in conducting suspicionless drug-screening, the court must first ascertain whether this case presents a special governmental need beyond the normal need for law enforcement.[1]  In simpler terms, before the court can balance the competing interests in this case, it must first ask what is so impractical about requiring a warrant or individualized suspicion in the circumstances presented here.  It is in this threshold inquiry that I believe the majority first errs.

The majority frames its analysis in terms of whether "unlawful drug use is ... fundamentally incompatible with high state office."

---

[1]Whether "[s]pecial needs are involved" in this case is determined not by how urine test results will be used against any particular candidate, but by whether the "need" for such testing is *already* served by ordinary law enforcement, and is of such a "special" nature as to render the Fourth Amendment's warrant requirement impracticable.

Certainly, the answer to that question is patently obvious, but the question *assumes* unlawful drug use.[2] This case is not about the incompatibility of drug use and elected office, but rather about whether Fourth Amendment protections can be constitutionally suspended when there is no individualized suspicion, when there is no immediate or direct threat to public safety, when those being searched are not directly involved in the frontlines of drug interdiction, when there is no institutional setting involved such as a prison or public school requiring swift and informal discipline, and when there are no dire consequences as a result of waiting to obtain a warrant if a candidate, or anyone else for that matter, is suspected of violating the law. The first question for the court is *not* whether the state's interest is great enough and its chosen method effective enough to outweigh the privacy interests involved. Rather, it is whether, under *Von Raab,* the circumstances in this case give rise to a *special* governmental need beyond the ordinary needs of law enforcement in the first place. I think not, and the majority's analysis does not support its conclusion to the contrary.[3]

Essentially, the majority's justification for suspending the

---

[2]O.C.G.A. § 21-2-140 bars from public office either candidates who refuse to take the test because they are ideologically opposed to the government's intrusion upon their privacy, or candidates who fail the test and are thereby only *suspected* of having committed a crime.

[3]The majority's reference to the Tenth Amendment interest in setting qualifications for public office misses the point. Georgia's power under the Tenth Amendment to regulate its electoral process is not absolute. As the majority notes, the state's power to do so is subject to federal constitutional limitations, the extent of which are at issue here.

requirements of the Fourth Amendment is the state's interest in officeholders who are "drug free," "honest[ ], clear-sighted[ ], and clear-thinking," as well as "appreciative of the perils of drug use" and "[ ]sympathetic to drug interdiction efforts."  Putting aside First Amendment concerns as to whether these subjective traits, as desirable as they may be, can be legislated as valid qualifications for public office, this standard not only fails to address why ordinary law enforcement methods are insufficient to protect these interests, but it makes suspicionless searches the rule and obtaining a warrant almost always irrelevant.[4]  Moreover, this rationale seriously erodes the Fourth Amendment's protections for many people beyond the parties involved here.

The Supreme Court has rejected such an overbroad standard in assessing the reasonableness of various governmental drug-testing schemes.  In *Skinner* and *Von Raab,* the Court suspended Fourth Amendment protections only when the risks of drug impairment affected those directly on the frontline of drug interdiction efforts, or those who, if under the influence of drugs, could pose an imminent physical threat to the public.  The Court found a nexus between the risks of drug use and imminent hazards to public safety, for example, where government employees "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner,* 489

---

[4]Under this standard, what Fourth Amendment protections would candidates retain to prevent suspicionless testing to research for a physical or mental impairment, AIDS, alcohol or prescription drug abuse, screening DNA for genetic information, or to prevent warrantless invasions of homes to search for drugs, pornography, or other contraband?

U.S. at 628, 109 S.Ct. at 1419. The Court held that railway safety is a special governmental need beyond the normal need for law enforcement and justifies the suspicionless urine testing of those employees whose drug and alcohol abuse can "cause great human loss," but noted that the regulations "narrowly and specifically" limited testing to the aftermath of a serious accident when individualized suspicion is "most impracticable," or when employees are otherwise directly involved in safety-rules violations. *Id.* at 622, 631, 109 S.Ct. at 1416, 1420-21. Moreover, the Court upheld drug testing only after a showing of past history linking drug and alcohol abuse with serious train accidents. *Id.* at 606-08, 109 S.Ct. at 1407-08.

In *Von Raab,* the Court likewise required such a nexus in upholding suspicionless urine testing of Customs employees who are involved *directly* in enforcing drug laws, or are required to carry firearms. *Von Raab,* 489 U.S. at 670-71, 109 S.Ct. at 1393. While the Court found compelling the Customs Service's interest in "ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment," it also specifically explained how that compelling interest would be undermined by unlawful drug use among such front-line personnel: "A drug user's indifference to the Service's basic mission, or, even worse, his active complicity with malefactors, can facilitate importation of sizable drug shipments or block apprehension of dangerous criminals." *Von Raab,* 489 U.S. at 670, 109 S.Ct. at 1393. The Court recognized that "the public should not bear the risk that employees who may suffer from impaired perception and

judgment will be promoted to positions where they may need to *employ deadly force."* *Id.* at 671, 109 S.Ct. at 1393 (emphasis added).

The narrow focus of these exceptions was reaffirmed in *Vernonia School District 47J v. Acton,* --- U.S. ----, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). The Court held that special governmental needs justify randomly testing the urine of schoolchildren, who hold a diminished expectation of privacy in the public school custodial setting, but noted that "it must not be lost sight of that this program is *directed more narrowly* to drug use by school athletes, where the risk of *immediate physical* harm to the drug user or those with whom he is playing his sport is particularly high." *Acton,* --- U.S. at ----, 115 S.Ct. at 2395 (emphasis added). Thus, it appears that even (unathletic) schoolchildren enjoy greater Fourth Amendment protections than the majority accords the candidates in this case.

There is nothing so special or immediate about the generalized governmental interests involved here as to warrant suspension of the Fourth Amendment's requirement of individualized suspicion for searches and seizures. There are no exigent circumstances. There is no imminent threat of grave physical harm. The prospective candidates are not on the frontlines of drug interdiction. And, we cannot ignore that candidates are subjected to the ultimate screening program—the voice of the electorate. Thus, I believe the majority errs in concluding that a special governmental need beyond the normal need of law enforcement is present in this case.

In addition to being troubled by the majority's assumption

that a special governmental need beyond the normal need for law enforcement exists which makes obtaining a warrant impractical in this case, I am troubled by the majority's assessment and balancing of the competing interests involved. This case presents a more serious constitutional question than that in *Von Raab* and *Skinner* because of the nature and magnitude of the individual rights involved.

Even if privacy interests are viewed in the narrowest sense, a candidate's legitimate expectation of privacy in his or her bodily fluids is greater than the employees in *Von Raab* or *Skinner.* In balancing the privacy interests of the employees in *Von Raab,* the Court recognized that Customs officers already agree to undergo intrusive screening as a condition of employment: "*Unlike most private citizens or government employees in general,* employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity." *Von Raab,* 489 U.S. at 672, 109 S.Ct. at 1394 (emphasis added). The Court likened the necessity in those circumstances to the "extraordinary assurances of trustworthiness and probity" and "intrusive inquiries into ... physical fitness" required of those who undertake "special positions" such as in our military or intelligence services. *Id.* at 671, 109 S.Ct. at 1394. In *Skinner,* the Court likewise recognized that "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Skinner,* 489 U.S. at 627, 109 S.Ct. at 1418.

I recognize that employment choices may indeed diminish expectations of privacy. An individual need not choose to become a drug interdiction agent, military intelligence officer, or railway engineer, thereby avoiding the intensive training and intrusive screening required by that particular job. But, an individual does not have a constitutional right to a specific kind of employment. The Constitution, however, protects participation in government. While candidates relinquish to the people a great deal of their privacy in choosing to run for public office, the price should not include sacrificing one's Fourth Amendment right to be free from unreasonable searches and seizures.

In conducting the *Von Raab* balancing test, the majority fails to adequately consider the totality of the government's "interference with individual liberty." *Von Raab,* 489 U.S. at 671, 109 S.Ct. at 1393. Not only is the privacy surrounding an individual's bodily functions at stake, but all of the rights associated with participating in a democracy—rights of association, freedom of speech, ballot access, and the right to cast an effective ballot. We are not dealing merely with the denial of a job opportunity, but with the denial of opportunity to participate in our democratic form of government. In light of the interference with these liberty interests, giving the governmental interests here the greater weight seems especially unreasonable.

Finally, I am concerned about the majority's conclusion that the government's actions in this case do not violate the First Amendment. The majority maintains that the government's purpose is not suppression of free expression. Yet, it supports its holding

by citing the importance of ensuring that elected officials are "persons appreciative of the perils of drug use" and "[ ]sympathetic to drug interdiction efforts." Establishing a certain ideology as a "qualification" for holding public office appears to be a content-based restriction on free expression.[5] Drug policy is a politically charged issue confronting many government officials who have disparate points of view regarding the "Drug War" and the efficacy of the means employed in fighting it. It is the function of public office holders to write, enforce, and interpret the laws, including drug laws. By conditioning holding public office upon submission to drug screening, however, the Georgia legislature effectively bans from positions of political power not only those candidates who might disagree with the current policy criminalizing drug use, but also those who challenge the intrusive governmental means to detect such use among its citizenry. This statute is neither neutral nor procedural, but, in the majority's own characterization, attempts to ensure that only candidates with a certain point of view qualify for public office.

It is beyond peradventure that a bodily search is significantly intrusive. It is almost equally obvious that the means utilized here would not accomplish the goals purportedly

---

[5]The Supreme Court struck down a previous attempt by the Georgia legislature to disqualify a citizen from public office on the basis of his ideology, noting that: "Madison and Hamilton anticipated the oppressive effect on freedom of expression which would result if the legislature could utilize its power of judging qualifications to pass judgment on a legislator's political views." *Bond v. Floyd,* 385 U.S. 116, 135-37 n. 13, 87 S.Ct. 339, 349-50 n. 13, 17 L.Ed.2d 235 (1966) (holding legislature's use of oath provisions to exclude from its ranks one with whom its majority disagreed on federal government's policy in Vietnam War violated First Amendment).

justifying the search. [6]   Thus, this search is more a symbolic

gesture than an effective tool to ferret out drug-users or assure

exemplary public officials.[7]   Surely, symbolic gestures are not

---

[6]The majority recognizes that, considering the notice given, any drug user could disguise drug use, and that "[p]ersons who would be caught by Georgia's limited testing would seem to be people who are out of control about drugs...."  It also seems that these "worst cases" would be ideal candidates for some form of individualized suspicion.

[7]The majority has delineated the government's purported interest in ensuring that candidates "have what it takes" to hold public office as justification for the suspicionless urine testing of candidates.  However, the available subsequent legislative history indicates that in passing O.C.G.A. § 21-2-140, the Georgia General Assembly did not appear to be motivated by concerns that state politicians exercise their "best judgment and skill," but rather by the desire to enact a symbolic measure:

> "One of the sponsor's of the original 1990 legislation ... proposed the legislation out of a sense of fairness rather than any genuine fear that state politicians were not drug free.  The sponsor of the 1990 legislation felt that if city council or state politicians require drug testing of state employees, they too should undergo drug testing.  Additionally, if in order to appease public concern about the use of illegal drugs politicians must infringe upon the rights of government employees, the politicians themselves should be treated similarly."

Edith M. Shine, *Legislative Review,* 9 Ga.St.U.L.Rev. 212, 218 (1992) (citing Telephone Interview with Rep. Bob Holmes, House District No. 28 (Apr. 10, 1992)) (footnotes omitted). Representative Holmes stated that the legislation was proposed in response to similar legislation that required school teachers to undergo urine testing because it was unfair to subject teachers to urine tests unless the politicians enacting such a law also were tested. *Id*. at 218 n. 61.  Nonetheless, the law did not apply to politicians who were already in office, but only to prospective candidates for those offices.  In any event, the Applicant Drug Screening Act, which precipitated the mandate for suspicionless testing of political candidates, was struck down later as an unconstitutional infringement of employment applicants' Fourth and Fourteenth Amendment rights. *Georgia Ass'n of Educators v. Harris,* 749 F.Supp. 1110, 1114 (N.D.Ga.1990) (holding generalized governmental interest in maintaining drug-free workplace not sufficiently compelling so as to outweigh applicants' Fourth Amendment

enough to trump the constitutional imperatives of the Fourth Amendment or the right to participate in government.

---

rights).

On a final note, Representative Holmes' comments are incapable of "chang[ing] the legislative intent ... expressed before the Act's passage," as in *Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974) because, as the majority notes, no "official" history of legislative intent exists.  Rather, this case is closer to *Galvan v. Press,* 347 U.S. 522, 526-27, 74 S.Ct. 737, 740, 98 L.Ed. 911 (1954) (relying on 1951 memorandum by Senator McCarran in interpreting ambiguous legislative intent of 1950 statute he sponsored).  We are left, therefore, with the wisdom of Mr. Chief Justice John Marshall that "[w]here the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived."  *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805) (*quoted in Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)).