ROVNER, Circuit Judge,
dissenting in part.
Protecting judicial integrity is a government interest of highest magnitude, as is protecting the rights guaranteed by the First Amendment. Reconciling these two competing interests is no small feat, and when evaluating the party membership restrictions in Section II.A and the personal solicitation restriction in Section II.C, I *991 believe the majority successfully navigates the competing concerns. As for the ban on endorsements of partisan candidates, the majority and I begin at the same starting point — with the notion that endorsements of candidates in political elections are troubling and have the potential to compromise judicial impartiality. I part ways with the majority, however, where it applies the balancing test from Pickering and Connick to the endorsement ban. Pickering v. Bd. of Ed. of Twp. High Sch. Disk 205, Will County, III., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Because I believe this is the wrong test to apply, I respectfully dissent.
Laws and regulations that restrict speech on the basis of content are subject to the high hurdle of the strict scrutiny test. United States v. Playboy Entm’t Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Such laws are “presumptively invalid, and the Government bears the burden to rebut that presumption.” United States v. Stevens, - U.S. -, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (internal citations omitted); Playboy Entm’t Group, 529 U.S. at 813, 817, 120 S.Ct. 1878. In addition, speech about the qualifications of candidates for public office is at the core of First Amendment freedoms and is thus also strictly scrutinized. Republican Party of Minn. v. White, 536 U.S. 765, 774, 781, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002); Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222-23, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). The law presumes that these intrusions on First Amendment rights are invalid and shifts the burden of proof to the government to demonstrate that these regulations are narrowly tailored to serve a compelling government interest. Stevens, 130 S.Ct. at 1584; Eu, 489 U.S. at 222, 109 S.Ct. 1013. There could be no clearer example of a restriction that is both content-based and that burdens speech regarding qualifications for office than the one at issue here: Wisconsin Supreme Court Rule 60.06(2)(b)4 states that no judge or candidate for judicial office may “[pjublicly endorse or speak on behalf of [a party’s] candidates or platforms.” SCR 60.06(2)(b)4. The majority concedes that under a strict scrutiny analysis, the regulation at issue here would fail. Supra at 987. Rather than reach that unpalatable result, however, it has manufactured a new balancing test not heretofore applied to the First Amendment rights of elected judges.
It is true, of course, that some forms of speech fall outside the protections of the First Amendment, including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. See Stevens, 130 S.Ct. at 1584. And in the case of public employees, the Supreme Court has relaxed the scrutiny it applies to regulation of government employee speech, holding that a public employee’s right to speak on matters of public concern must be balanced against the government’s need for efficient operation of government functions. Garcetti v. Ceballos, 547 U.S. 410, 418-19, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); Connick, 461 U.S. at 142, 103 S.Ct. 1684; Pickering, 391 U.S. at 568, 88 S.Ct. 1731. Neither this court nor the Supreme Court, however, has ever held that these decisions limiting the speech of public employees can be applied to elected officials’ speech, including the speech of elected judges.
In the seminal case on free speech and judicial codes of conduct, the Supreme Court applied strict scrutiny in evaluating the challenged provisions of Minnesota’s Code of Judicial Conduct. White, 536 U.S. at 774, 122 S.Ct. 2528. Although the White decision considered the rights of *992 candidates seeking judicial office as opposed to those already holding office, the language of the decision reflects two important principles that apply to the case before us today — the Court’s recognition that political speech is highly protected and that content-based restrictions must be viewed most skeptically. Id. The court in White stated,
the notion that the special context of electioneering justifies an abridgement of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. Debate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms, not at the edges. The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.
Id. at 781,122 S.Ct. 2528 (internal citations omitted) (emphasis in original).
In White, it was undisputed and uncontroversial that the court should apply strict scrutiny in evaluating the content-based restrictions of the canons of judicial conduct. Id. at 774, 122 S.Ct. 2528. Even the two dissenting opinions, which vigorously defended the particular speech restrictions on judges, did so while applying strict scrutiny. See White, 536 U.S. at 800, 122 S.Ct. 2528 (Stevens, J., dissenting) (“Minnesota has a compelling interest in sanctioning such statements.”); Id. at 817, 122 S.Ct. 2528 (Ginsburg, J., dissenting) (“In addition to protecting litigants’ due process rights, the parties in this case further agree, the pledges or promises clause advances another compelling state interest: preserving the public’s confidence in the integrity and impartiality of its judiciary.”). In short, both the majority and dissent in White applied strict scrutiny to a content-based speech prohibition for judicial candidates.[1]
Nevertheless, as Justice Kennedy noted in his concurrence, the White decision left open the question as to whether “the rationale of Pickering and Connick could be extended to allow a general speech restriction on sitting judges — regardless of whether they are campaigning — in order to promote the efficient administration of justice....” White, 536 U.S. at 796, 122 S.Ct. 2528 (internal citations omitted).
Although the White court left the question unanswered, that opinion and others provide compelling support for the proposition that strict scrutiny is the proper test for evaluating restraints on an elected judge’s speech. The Supreme Court has long found the speech of elected officials to be as protected as that of ordinary citizens. In Bond, the Supreme Court held that the State of Georgia could not exclude a state representative from membership in the legislature based on his criticism of the Vietnam War. Bond v. Floyd, 385 U.S. 116, 133, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). The Court specifically noted that the interest of the public in hearing all sides of a public issue is advanced by extending the *993 same First Amendment protections to legislators as to ordinary citizens. Id. at 136, 87 S.Ct. 339. The Court later held the same for a sheriff who questioned the motivations of a judge’s charge to a grand jury. The Court reasoned that “the role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.” Wood v. Georgia, 370 U.S. 375, 395, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). Forty years later, a majority of the Supreme Court repeated this same statement in evaluating the restrictions imposed by a canon of judicial conduct. White, 536 U.S. at 781-82, 122 S.Ct. 2528. After reviewing White, and its analyses of these earlier cases, the Fifth Circuit concluded that strict scrutiny was the appropriate test for evaluating a state’s interest in suppressing a sitting judge’s speech. Jenevein v. Willing, 493 F.3d 551, 557-58 (5th Cir.2007).
In contrast, non-elected employees, like those covered by the Hatch Act, are subject to a test which balances the interests of the employee as a citizen, in commenting upon matters of public concern, against the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. See U.S. Civil Serv. Comm’n v. Nat’l Assoc. of Letter Carriers, 413 U.S. 548, 561, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). The Hatch Act restricts the speech of government employees by prohibiting them from taking an active part in political management or political campaigns, but notably exempts the two elected executive branch employees, the president and vice president, from coverage. 5 U.S.C. § 7322(1); See also Letter Carriers, 413 U.S. at 561, 93 S.Ct. 2880. In sum, no Supreme Court decision or Seventh Circuit case has applied a balancing test to the speech of elected officials.
It would be folly, of course, to ignore the reality that elected judges are different from elected legislators and executives. “Legislative and executive officials act on behalf of the voters who placed them in office; judges represent the Law.” White, 536 U.S. at 803, 122 S.Ct. 2528 (Ginsburg, J., dissenting) (internal citations omitted). See also Buckley v. Ill. Judicial Inquiry Bd., 997 F.2d 224, 228 (7th Cir.1993) (“Judges remain different from legislators and executive officials, even when all are elected, in ways that bear on the strength of the state’s interest in restricting their freedom of speech.”).
This distinction, however, does not warrant abandoning a strict scrutiny analysis of content-based regulations of speech about the political qualifications of candidates for elected office. Content-based regulations are, after all, some of the most reviled by the First Amendment and election speech among the most protected. There is no doubt that the due process rights guaranteed by the Fourteenth Amendment are equally compelling, but we need not abandon well-settled First Amendment jurisprudence and set aside strict scrutiny to protect due process, as the majority claims. Rather, the solution is to apply strict scrutiny but give proper weight to the exceedingly compelling interest the state has in ensuring an impartial and fair judiciary. See id. at 228 (noting that the fact that elected judges are different from elected legislators and executive officials bears on the strength of the state’s interest in restricting their freedom.). See also White, 536 U.S. at 783, 122 S.Ct. 2528 (“we neither assert nor imply that the First Amendment requires campaigns for judicial office to sound the same as those for legislative office.”). In evaluating a restraint on judge’s speech under a strict scrutiny analysis, a court must consider its hefty obligation to provide litigants with a fair adjudicative pro *994 ceeding by an impartial and disinterested tribunal — a right guaranteed by the Due Process Clause of the Fourteenth Amendment, as well as its obligation to preserve public confidence in the integrity and impartiality of the judiciary. See White, 536 U.S. at 813, 817, 122 S.Ct. 2528 (Ginsburg, J., dissenting).
Furthermore, although elected judges are not the same as elected legislators and executives, they are also not entirely like judges appointed for life or for fixed terms — immune from the influence of popular opinion. As Justice Scalia pointed out in White, a judge contemplating releasing a notorious terrorist is well aware that she faces the pressure of being voted out of office come the next election cycle. Id. at 782, 122 S.Ct. 2528. Thus, in some limited sense, elected judges, for better or for worse, know that they serve at the pleasure of the public. And although a state is free to establish any constitutional system it wishes to populate its benches, states that choose to elect judges have made a particular decision about the role of the public in the selection of judges.
Our federal Constitution, of course, provides for appointment of judges for life. As Justice O’Connor recounted in White, the first twenty-nine states did not use elections for selecting judges. White, 536 U.S. at 791, 122 S.Ct. 2528 (O’Connor, J., concurring). In the 1830’s and 1850’s as part of the Jacksonian movement toward greater popular control of public office, many states turned from appointing judges to popular elections. Id. Thirty-one states have turned from non-electoral systems to popular elections. Id. at 792, 122 S.Ct. 2528. There may be many reasons why a state opts to elect judges, but such a decision reflects, at least in part, a policy decision that to the extent that judges have any discretion to mold the law — and of course they do — the people should be able to have some say in how that discretion will be used. For example, in the area of sentencing where discretion can be large, the public may choose to elect candidates who are “tough on crime” or who “judge with compassion.” The choice to elect judges may also represent an attempt to allow the people to choose among the populace the person they see as most fit to judge, but embedded in this choice is most certainly some consideration about how that candidate understands and would apply the law. The decision to hold judicial elections, therefore, may negatively impact the integrity of the judiciary in ways that are unavoidable, see White, 536 U.S. at 782, 122 S.Ct. 2528; see also id. at 789, 122 S.Ct. 2528 (O’Connor, J., concurring) (explaining why the very practice of electing judges undermines the interest in an impartial judiciary), but it is, nevertheless, a legitimate choice by a state.
Having made a policy decision allowing the public to shape the bench, a state must permit judges greater leeway to communicate their opinions. Thus, although elected judges are not like other elected officials, they are also not like public employees subject to Pickering- — -that is, employees who answer only to the government as employer and not to the public at large. As the majority in White pointed out, “if the State chooses to tap the energy and the legitimizing power of the democratic process [in the election of judges], it must accord the participants in that process the First Amendment rights that attach to their roles.” White, 536 U.S. at 788, 122 S.Ct. 2528. “Opposition [to electing judges] may be well taken (it certainly had the support of the Founders of the Federal Government), but the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about.” Id. at 787-88, 122 S.Ct. 2528. Endorsements are part of that discussion *995 in much the same way that announcing one’s views on the legal issues of the day are — the issue before the court in White. We are, after all, often judged by the company we keep. There is much to say about the utility and harm of endorsements, but because my disagreement with the majority is over the level of scrutiny to be applied to the regulation, I need not spill ink evaluating the benefits and harms of endorsements. Most importantly, it is important to note that applying strict scrutiny will not mean that the speech of sitting judges cannot be regulated more restrietively than the speech of other elected officials; it most certainly can. The state, after all, has an exceptionally compelling interest in protecting the integrity of the judiciary and the due process rights of litigants.
In short, I would apply a strict scrutiny test to the announce clause at issue in this case. Whatever the result may be in an ordinary case where a state passes a blanket prohibition on endorsements by sitting judges, the result here is made simple by the fact that Wisconsin allows endorsements for non-partisan but not partisan elections. As even the majority concedes, the under-inclusiveness of the provision is fatal to the rule’s constitutionality when applying strict scrutiny. See supra at 967; see also White, 586 U.S. at 780, 122 S.Ct. 2528.
Wisconsin has opted to allow judges to endorse candidates in non-partisan elections. Such endorsements threaten judicial fairness and the appearance of fairness no less than endorsements in partisan elections. Lawyers and judges who lose non-partisan judicial elections, for example, go right back to practicing (and perhaps appearing as litigants) in the same small circuits in Wisconsin in which they ran and were endorsed by sitting judges. A criminal defendant prosecuted by such an endorsed attorney will not question the fairness of his trial any less because the prosecuting attorney ran in a non-partisan rather than a partisan election. And a judge who makes or breaks a non-partisan candidate’s career is no less of a power broker than one who endorses a partisan candidate. It may be true that party-affiliated sheriffs and prosecutors appear frequently in courtrooms, but it is also true that frequent litigators, who are the very same lawyers who are most qualified and most likely to run for judge, should they lose, will go right back to litigating before those same judges who endorsed them.
By allowing endorsements in non-partisan elections, Wisconsin has largely eviscerated the force of any asserted concern. A regulation that is so under-inclusive diminishes the credibility of the government’s rationale for restricting speech. White, 536 U.S. at 780, 122 S.Ct. 2528.
Perhaps the endorsement provision causes us such unease because we expect a judge not to use her office for personal gain — either her own or others’. In fact, Wisconsin Supreme Court Rule 60.03(2) prohibits improper use of the visibility and prestige of the judicial office. Endorsements arguably use the visibility and prestige of the judicial office in an improper manner. Wisconsin, however, has not articulated this as its interest and indeed cannot, as it allots endorsements in nonpartisan races.
Although I disagree with the majority about the proper test to apply, it is likely that under different circumstances our outcome would nevertheless be the same and I would find myself concurring in the result. My dissent stems entirely from the unique situation presented here. Wisconsin has opted to elect judges in popular elections and has further mired those judges in that political process by allowing them to make nonpartisan endorsements. Endorsements undermine the integrity of *996 the judiciary regardless of whether they focus on partisan or non-partisan races. Once Wisconsin greased the slope for nonpartisan endorsements, it should not have been surprised that partisan endorsements could come sliding after. Wisconsin has failed to demonstrate that its endorsement ban is narrowly tailored to prevent the harm it asserts.

. In his concurrence, Justice Kennedy noted that he would go further and hold that "content-based speech restrictions that do not fall within any traditional exception should be invalidated without inquiry into narrow tailoring or compelling government interests. The speech at issue here does not come within any of the exceptions to the First Amendment recognized by the Court. Here, a law is directed to speech alone where the speech in question is not obscene, not defamatory, not words tantamount to an act otherwise criminal, not an impairment of some other constitutional right, not an incitement to lawless action, and not calculated or likely to bring about imminent harm the State has the substantive power to prevent. No further inquiry is necessary to reject the State's argument that the statute should be upheld.” White, 536 U.S. at 792-93, 122 S.Ct. 2528 (Kennedy, J., concurring).