The Honorable Jim Howell State Representative, District 82
125 East Buckthorn Road Derby, KS 67037
Dear Representative Howell:
As Representative for the 82nd District, you ask whether Attorney General Opinion No. 2008-08, which outlines the scope of K.S.A. 2010 Supp. 74-8762(e), remains the opinion of this office. Specifically, you inquire whether a Kansas State Representative is prohibited from expressing an opinion, or the opinion of constituents, during a public hearing on gaming matters under the Kansas Expanded Lottery Act (KELA). At issue is K.S.A. 2010 Supp. 74-8762(e), which prohibits state officials from using official authority to influence decisions of the Lottery Commission, the Lottery Gaming Facility Review Board (Review Board) and the Kansas Racing and Gaming Commission (KRGC) regarding the selection of a lottery gaming facility manager. *Page 2 
We state at the outset that we are limiting our analysis to the specific aspects of Attorney General Opinion No. 2008-08 that relate to your question. In order to answer your question, we must first address (1) our prior opinions pertaining to K.S.A. 74-8762(e), (2) historical origins of conflict of interest legislation, and (3) the framework for evaluating the constitutionality of statutory restrictions on free speech.
Background
The KELA was passed during the 2007 Kansas Legislative Session as SB 66[1]. Section 31(e) of SB 66, now codified at K.S.A. 2010 Supp. 74-8762(e), provides in relevant part:
 No state or local official shall influence, or attempt to influence, by use of official authority, the decision of the Kansas lottery commission, lottery gaming facility review board or Kansas racing and gaming commission pursuant to this act; the investigation of a proposal for a lottery gaming facility or racetrack gaming facility pursuant to this act; or any proceeding to enforce the provisions of this act or rules and regulations of the Kansas lottery commission or Kansas racing and gaming commission.
Willful violation of this statute is a Class A misdemeanor, which carries the potential penalty of up to one year in the county jail, or up to a $2,500 fine, or both.[2]
Three prior Attorney General Opinions have analyzed this statute. Opinion No. 2007-33 addressed the issue of whether Sumner County officials could lawfully "voice their concerns" to gaming officials[3] regarding the selection of a lottery gaming facility manager. That opinion concluded that the statute did not apply to the Sumner County officials because Section 31(a)(2)(F) of SB 66, later codified at K.S.A. 2007 Supp. 74-8762(a)(2)(F), limited the definition of "local official" to include only those governing body members in cities and counties where a lottery gaming facility is located, and at that time, no such facility was located in Sumner County.[4] Thus, it was determined that the application of the statute to the Sumner County officials would not be "triggered" until a lottery gaming facility management contract was awarded in Sumner County.
Attorney General Opinion No. 2008-18 addressed the issue of whether Sumner County commissioners or their representatives could lawfully testify at Review Board hearings regarding which of three possible lottery gaming facility management contracts would be the best possible contract for Sumner County. Revisiting Attorney General Opinion No. 2007-33, this office determined that limiting the definition of "local official" in K.S.A. 2007 Supp. 74-8762(a)(2)(F) only to those governing body members in cities and counties where a lottery gaming facility management contract already has been signed, *Page 3 
which by consequence would exempt Sumner County officials from the prohibitions within K.S.A. 2007 Supp. 74-8762(e), would "gut the intent" of the prohibition against using official authority to influence the decisions of gaming officials:
 As no contract can be awarded until the Review Board makes its selection and the KRGC approves it, members of city and county governing bodies vying for a gaming facility could, with impunity, attempt to use their official authority to influence the Lottery Commission, Review Board and the KRGC during the selection process.[5]
Attorney General Opinion No. 2008-18 ultimately concluded that in order to implement the intent of the KELA, K.S.A. 2007 Supp. 74-8762(a)(2)(F) should be interpreted to apply to members of a governing body of a city or county where a gaming facility may be located. As such, to the extent that Attorney General Opinion No. 2007-33 conflicted with this analysis, it was withdrawn. This approach was consistent with the duty of courts to interpret statutes to "give effect to the legislature's intent even though words, phrases, orclauses at some place in the statute must be omitted orinserted."[6]
Attorney General Opinion No. 2008-08, to which your inquiry specifically refers, addressed the scope of K.S.A. 2007 Supp. 74-8762(e) as applied to local officials seeking to provide comments, testimony or recommendations to gaming officials, whether during or outside a public meeting. That opinion described the activities of the Lottery Commission, the Review Board and the KRGC that would constitute "decisions," "investigations" and "proceedings" under K.S.A. 2007 Supp. 74-8762(e), and concluded that the statute applied to local officials only when the subject matter involved those activities.[7] That opinion further concluded that public officials are not precluded from offering public comment or testimony in proceedings before gaming officials in their capacity as private citizens, but would be so prohibited if testifying in their official capacity.
While each of these opinions has discussed the prohibitions within K.S.A. 74-8762(e), none of them has directly addressed the question you pose, namely, whether this statute is an unconstitutional limitation on the First Amendment rights of public officials. Similarly, no prior opinion analyzes whether any legal difference exists in applying the statute to speech at public hearings as opposed to other speech that may best be *Page 4 
described as ex parte. Our analysis requires a discussion of the origins of K.S.A. 74-8762(e), as well as the rules courts apply when determining whether a restriction of speech is constitutional.
The Hatch Act and Restrictions on Political Activity
The prohibition against the use of official authority to influence or attempt to influence official decisions can be traced to the federal Hatch Act of 1939.[8] The Hatch Act built upon a series of statutes dating back to 1789 which imposed various restrictions on the political and private activities of public employees, such as prohibiting federal judges from engaging in private legal practice.[9] The purpose of such laws was to "promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service."[10] Continuing in that vein, the Hatch Act was captioned "An Act to prevent pernicious political activities."[11]
As originally enacted, the Hatch Act made it unlawful for a federal employee to "use his official authority or influence for the purpose of interfering with an election or affecting the result thereof."[12] Federal employees were also prevented from taking "active part in political management or political campaigns," although such employees "shall retain the right to vote as they may choose and to express their opinions on all political subjects."[13] Notably, although the Hatch Act limited political activities of federal employees, the right of such employees to voice political opinions was expressly protected.
The Hatch Act was challenged on First Amendment grounds in two landmark cases. The first, United Public Workers of America v.Mitchell, examined whether an employee who violates the Hatch Act by taking active part in political management or political campaigns can be subject to disciplinary action on those grounds alone without violating the Constitution. The Supreme Court noted that First Amendment rights "are not absolutes,"[14] and may be subject to the "elemental need for order" and reasonable limitations such as time and place restrictions.[15] In upholding the constitutionality of the Hatch Act, the Court determined that limiting the political activity of federal employees was "within reasonable limits" of regulation, and summarized its opinion as follows:
 When actions of civil servants in the judgment of Congress menace the integrity and the competency of the service, legislation to forestall such danger and adequate to maintain its usefulness is required. The Hatch Act is the answer of Congress to this need. We cannot say with such a *Page 5 
background that these restrictions are unconstitutional.[16]
Later, in United States Civil Service Commission v. NationalAssociation of Letter Carriers, [17] the Supreme Court upheld its prior decision in Mitchell, stating that "Congress had, and has, the power to prevent" a broad variety of political activities by federal employees. The Court stated, "Our judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees."[18]
It is notable that both the Mitchell and LetterCarriers courts found the fact that public employees were still permitted to express their opinions on all political subjects as evidence that the Hatch Act's prohibitions were not unconstitutionally overbroad.[19]
Origins and Legislative Intentof K.S.A. 2010 Supp. 74-8762(e)
The language of K.S.A. 2007 Supp. 74-8762 is borrowed largely from the New Jersey Conflicts of Interest Law, which seeks to prevent corruption in the state's casino industry.[20] The New Jersey law was enacted in light of "the acute vulnerability of the Casino industry, and the evident legislative purpose to eliminate even the appearance of impropriety or conflict involving public officials in all walks of government. . . ."[21]
The law prohibits local officials from influencing or attempting to influence decisions by the New Jersey Casino Control Commission regarding casino licensure and investigations into possible violations of state regulations.[22]
There have been very few cases involving the New Jersey Conflicts of Interest Law. To date no court has invalidated the law. The Superior Court of New Jersey upheld the Conflicts of Interest Law, arguing that the law furthered a compelling state interest, was narrowly tailored, not overbroad and was rationally related to the compelling state interest:
 Given the acknowledged vulnerability of the casino industry to organized crime and the compelling interest in maintaining the public trust, not only in the casino industry but also the governmental process which so closely regulates it, there is no viable alternative available to prevent the appearance of, or actual, corruption of the political process in New Jersey."[23] *Page 6 
The New Jersey Conflicts of Interest Law is intended to prevent corruption of casinos, particularly as it relates to organized crime. Unfortunately, as discussed below, we lack a definitive record from which to discern the Kansas Legislature's intent in enacting the statute at issue in this opinion.
Legislative Intent of 2007 Senate Bill 66
Section 31(e) of 2007 SB 66, later codified at K.S.A. 2007 Supp. 74-8762(e), was originally part of 2007 House Bill 2055. There was one hearing on HB 2055 in the House Federal and State Affairs Committee, during which no proponent or opponent addressed the bill's restrictions on using official authority to influence decisions of gaming officials.[24] HB 2055 was not voted on by the Committee, but the text of HB 2055 was later offered on the House floor as an amendment to 2007 SB 66.[25] There were many attempts to further amend SB 66 after the successful motion to amend the bill by inserting the text of HB 2055, but the Journal of the House lacks a description of testimony to explain the intent of this particular section. Similarly, the Senate Journal notes simply that when the House amendments to SB 66 came to the Senate floor for debate, "A twelve hour debate on SB 66 ensued."[26] Thus, the legislative record lacks a clear explanation of the intent behind the prohibitions in K.S.A. 2010 Supp. 74-8762(e).
However, a fundamental rule of statutory interpretation is that "[t]he legislature is presumed to have expressed its intent through the language of the statutory scheme."[27] When evaluating legislative intent, "[e]ffect must be given, if possible, to the entire act and every part thereof."[28] Thus, we must consider K.S.A. 2010 Supp. 74-8762(e) in the context of the KELA as a whole.
The KELA contains numerous provisions to ensure that the process of selecting a lottery gaming facility manager is a fair, objective and open process. Such safeguards include:
 • Special conflicts of interest rules applicable only to the Executive Director of the KRGC, Lottery Commission members, and employees of the Kansas Lottery;[29]
 • The Lottery Commission must publish its procedures to evaluate management contracts in the Kansas Register for public inspection;[30]
 • The Lottery Commission must establish standards to promote the integrity of the gaming and finances of lottery gaming facilities, which must be included in all management contracts;[31] *Page 7 
 • Members of the Review Board may not have a financial interest in the outcome of Board decisions;[32]
 • The Review Board must conduct public hearings to aid in the determination of which lottery gaming facility management contract should be selected;[33] and,
 • The KRGC must fully review decisions by the Review Board.[34]
We note that K.S.A. 2010 Supp. 74-8762(e) does not expressly bar speech or expression, but rather prohibits the use of official authority to "influence" gaming officials. The KELA does not define what is meant by "influence." In Kansas statutes, the term "influence" usually refers to undue influence, corruption or coercion. Examples include the crime of interference with the judicial process by attempting to influence judicial officers[35], the crime of bribery, [36] and civil service statutes prohibiting state employees from accepting gifts designed to influence the performance of their duties.[37] A similar interpretation of the meaning of "influence" would be consistent with the overall intent of the KELA, which seeks to safeguard state gaming facilities from corruption and abuse.
Taken as a whole, the KELA seeks to establish a framework for the selection and oversight of gaming facilities that allows for public input and scrutiny, and minimizes the likelihood of corruption and conflicts of interest among decision-makers. Applying the rule that "courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof in pari materia,"[38] we opine that the intent of K.S.A. 2010 Supp. 74-8762(e) is to preventcovert, corrupt and/or undue influence of the lottery gaming facility selection process.
Assuming that K.S.A. 2010 Supp. 74-8762(e) was not intended to completely bar local officials from expressing their opinion on gaming issues or providing accurate information to gaming officials, we must now consider how this statute should be interpreted in light of the First Amendment.
Trends in Court Holdings re: Legislator Speech *Page 8 
As a general rule, a legislator's speech is protected by the First Amendment. The United States Supreme Court summarized this long-standing rule as follows: "The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance."[39]
Several cases have considered the scope of legislators' First Amendment rights. In Bond v. Floyd, the United States Supreme Court examined whether the Georgia House of Representatives could constitutionally exclude Bond, an elected state Representative, from membership in the House on the basis of Bond's statements criticizing the United States' policy in Vietnam.[40] The Supreme Court reversed the District Court's determination that Bond's "right to dissent as a private citizen was limited by his decision to seek membership in the Georgia House."[41] The Court noted:
 The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy . . . Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them.[42]
The holding in Bond was applied in X-Men Security,Inc. v. Pataki.[43] In X-Men, the plaintiffs sued two New York State legislators after the legislators contacted state and federal officials in order to advocate against extending plaintiffs' contract with a publicly-funded enterprise, on the grounds that the plaintiffs' affiliation with the Nation of Islam rendered them unable to comply with state and federal anti-discrimination regulations. Holding that the legislators were entitled to qualified immunity for their statements, the court drew a distinction between the liability of persons who make decisions that may infringe on the First Amendment rights of others, and individuals who simply lobby for a particular decision: "speech by persons who are not decisionmakers and who merely engage in advocacy without threats, intimidation, or coercion is protected by the First Amendment."[44] The court summarized its holding as follows:
 In sum, just as the First Amendment protects a legislator's right to communicate with administrative officials to provide assistance in securing a publicly funded contract, so too does it protect the legislator's right to state publicly his criticism of the granting of such a contract to a given entity and to urge to the administrators that such an award would contravene public policy.[45] *Page 9 
Thus, it is a settled matter of law that legislators generally enjoy the same First Amendment freedoms as other citizens. Just as other citizens' First Amendment freedoms may be curtailed by reasonable time, space and manner limitations, [46] legislators' speech may be subject to reasonable limitations designed to protect the public interest. For example, legislators are prohibited from publishing political advertisements that are not labeled as an advertisement.[47] Such restrictions on free speech have been upheld as reasonable safeguards to protect the integrity of elections.[48]
In the recent case of Nevada Commission on Ethics v.Carrigan, the United States Supreme Court considered "whether legislators have a personal, First Amendment right to vote on any matter."[49] In that case, a city councilman was found to have violated a Nevada statute, which prohibits a public officer from voting or advocating the passage or failure of a matter in which the officer's judgment "would be materially affected by . . . [h]is commitment in a private capacity to the interests of others,"[50]
by voting in favor of a proposal that would confer financial benefits to his long-time friend and campaign manager. While the Court did not address whether the statute itself was constitutional, it described the long history of legislative and judicial recusal rules, whereby public officials are required to abstain from voting on matters in which they have a conflict of interest. In doing so, the Court acknowledged the constitutionality of limiting legislator speech where there is a risk of conflict of interest.[51]
While these cases are instructive and, taken together, support the long-standing acknowledgement of constitutional authority to limit public officials' speech when necessary to protect the public interest, they are not dispositive of your question because they do not address the scope of a legislator's right to advocate on behalf of his or her constituents. We next examine K.S.A. 2010 Supp. 74-8762(e) in light of First Amendment jurisprudence.
Constitutionality of K.S.A. 2010 Supp. 74-8762(e) on itsFace
A statute must clearly violate the Constitution before it may be struck down.[52] A court may invalidate a statute if it is unconstitutional "on its face," meaning that "no set of circumstances exists under which the Act would be valid."[53]
Generally, a law that is facially invalid on First Amendment free speech grounds is one that suppresses ideas based upon content, is overly broad, and/or is unconstitutionally vague.[54] A content-based *Page 10 
law restricts particular viewpoints, such as an ordinance banning protests criticizing city government. An overly broad law restricts significantly more speech than is permitted by the Constitution. For example, a statute restricting the possession of "depictions of nudity" would apply to pornography, but would also apply to protected expression such as works of art, medical texts, etc. Unconstitutionally vague laws are so unclear that a reasonable person cannot determine what type of behavior is prohibited. For example, a statute banning "any activity that may incite violence" does not clearly alert citizens to what types of activities are prohibited.
K.S.A. 2010 Supp. 74-8762(e) does not, by its wording, prohibit local officials from expressing any particular viewpoint, but rather places a blanket restriction on all actions intended to influence particular decisions. Based upon the long history of courts upholding similar statutes that restrict speech in furtherance of legitimate anti-corruption objectives, we believe this Kansas statute would withstand a facial challenge to its constitutionality. In our opinion, such language is not unconstitutional on its face because the statute is content-neutral and does not have the goal or effect of suppressing particular ideas. Further, a reasonable person can determine the types of behavior prohibited by the statute, so it is not unconstitutionally vague. However, as discussed below, the statute may be overbroad as applied to a public official seeking to present testimony at a public hearing.
Constitutionality of K.S.A. 2010 Supp. 74-8762(e) as Appliedto Public Officials Testifying Before Gaming Agencies
A statute also may be invalidated if it is unconstitutional asapplied, meaning that the statute is not facially unconstitutional, but its application to a particular person or entity, or in a particular manner, leads to an unconstitutional result. For example, the federal Flag Protection Act of 1989 criminalizes the conduct of any person who "knowingly mutilates, defaces, physically defiles, burns, maintains on the floor or ground, or tramples upon any flag of the United States."[55] The United States Supreme Court held that while this act is not an express content-based limitation on expression, it could not be applied constitutionally to prosecute individuals who burned flags to communicate dissatisfaction with government policies.[56]
Unlike content-based regulations, which are subject to strict scrutiny, content-neutral restrictions will not be found unconstitutional "provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing theyleave open ample alternative channels for communication of theinformation."[57] K.S.A. 2010 Supp. 74-8762(e) by its terms does not restrict speech based upon content, and it serves an important governmental interest by attempting to prevent corruption of state gaming agencies. However, the *Page 11 
statute does not leave open any alternative channels for legislators acting in their official capacity as elected representatives of the citizenry to present information to gaming officials; all such communications could be construed, under the reasoning of Attorney General Opinion No. 2008-08, as influencing or attempting to influence decisions by gaming officials, including otherwise protected speech.
K.S.A. 2010 Supp. 74-8762(e) is content-neutral by its terms, but we opine that this statute would be unconstitutionally overbroad if applied to a legislator seeking to testify in the legislator's official capacity at a public hearing concerning gaming issues.[58] As so applied, this statute would restrict the ability of public officials to engage in protected speech, such as providing truthful information about the needs and opinions of their constituents to a state agency in a public hearing.
Construing K.S.A. 2010 Supp. 74-8762(e) Consistent withLegislative Intent and the First Amendment
Although we opine that K.S.A. 2010 Supp. 74-8762(e) is constitutional on its face, the statute has clear First Amendment implications by prohibiting a range of activities, including speech, which may be used to influence a decision by gaming officials. When faced with such a situation, courts attempt to reconcile the statute with the Constitution:
 It is axiomatic that a statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so.[59]
When a statute appears to unintentionally restrict speech that would otherwise be protected, Kansas courts will interpret the statute to exclude protected speech. For example, in Phelps v.Hamilton, the Court of Appeals for the Tenth Circuit examined whether the Kansas criminal defamation statute unintentionally criminalized speech that is protected by the First Amendment. In holding that the statute was not unconstitutionally overbroad when interpreted to apply only to unprotected speech, the court noted:
 Kansas courts strive to avoid striking down statutes based on the unintended criminalization of protected conduct. Given Kansas' principles of statutory construction — searching for the intent of the legislature, seeking to uphold the statute against an overbreadth challenge, and avoiding an unintended criminalization of protected conduct — we do not view the challenged statute as criminalizing speech which the legislature knew was constitutionally protected, but rather as only intending to *Page 12 
criminalize unprotected speech.[60]
This analysis applies to your question as well. We do not believe that the Legislature intended to prohibit all speech by legislators on matters that may be decided by gaming officials, for the simple reason that such interpretation would be an overbroad restriction of speech in plain violation of the First Amendment. Such an interpretation would prohibit a legislator from doing the job that he or she was elected to do, namely to represent constituents in matters of importance to them. Furthermore, such an interpretation could have the unintended effect of depriving gaming officials of the information they need to select the best possible lottery gaming facility manager.
In construing K.S.A. 2010 Supp. 74-8762(e), we must also assume that the Kansas Legislature intended that the statute "be given a reasonable construction, so as to avoid an unreasonable or absurd result."[61] If only public officials are banned from influencing or attempting to influence decisions by gaming officials, but private citizens are not, then a legislator could lawfully attempt to influence such decisions, so long as the legislator does so in his or her capacity as a private citizen. This interpretation would lead to the absurd result that, so long as a legislator did not reveal his occupation, he could lawfully engage in speech that would otherwise be unlawful under K.S.A. 2010 Supp. 74-8762(e). Thus, in order to lawfully express his constituents' viewpoints to gaming officials, the legislator would be forced to conceal his status as an elected representative. Such an interpretation needlessly transforms K.S.A. 2010 Supp. 74-8762(e) from a content-neutral regulation of speech into a content-based regulation that would violate the First Amendment.
We also question whether regulating the content of a public official's speech in this manner has even a rational basis to justify such regulation. Attorney General Opinion No. 2008-08 seems to presume that, absent a legislator self-identifying as such, neither gaming officials nor other individuals attending a public hearing would know of the legislator's official title. This presumption is unreasonable. Assuming a local public official is well-known to his or her constituents, requiring that official to conceal his or her official title while testifying before gaming officials would create a fiction whereby those conducting the hearing must pretend that they are ignorant of the official's public office. We do not believe this was the intent of the Kansas Legislature.
Conclusion
To summarize, K.S.A. 2010 Supp. 74-8762(e) is part of a long line of statutes enacted in order to prevent private and political interests from affecting public officials' ability to discharge their duties fairly and efficiently. Such statutes have been upheld as constitutional when the limitation imposed on First Amendment freedoms is reasonable, narrowly tailored, and not overbroad. When a statute appears to infringe upon a *Page 13 
protected right, courts must attempt to construe the statute, consistent with legislative intent, so as to comport with constitutional limitations.
Attorney General Opinion No. 2008-08 concluded that a legislator may testify at a public hearing held by a gaming agency, but only in the legislator's capacity as a private citizen. In our opinion, this conclusion leads to the absurd result that the certain speech would be unlawful if spoken by a legislator in his or her official capacity, but the same speech would be lawful so long as the legislator conceals his or her official title. Furthermore, that opinion assumes that the KELA affords public officials ample alternative opportunities to express their opinions and those of their constituents on gaming matters. We do not believe such alternative opportunities exist for a public official to present truthful information to gaming officials on behalf of his or her constituents. As such, we opine that K.S.A. 2010 Supp. 74-8762(e) should be construed to permit a state or local official to testify about gaming matters at a public hearing in the same manner that private citizens are permitted to testify, and without restriction on the content of such testimony. Such an interpretation would preserve legislative intent to prevent the undue or corrupt influence of gaming decisions by allowing public scrutiny of the official's testimony. This interpretation would also afford public officials an alternative means of presenting information to gaming agencies, without requiring the official to conceal his or her status as a public official.
To the extent, and only to the extent, that Attorney General Opinion No. 2008-08 conflicts with this opinion, it is hereby withdrawn.
Sincerely,
Derek Schmidt Attorney General
Sarah Fertig Assistant Attorney General
DS:AA:SF:ke
[1] L. 2007, Ch. 110, currently codified at K.S.A. 2010 Supp. 74-8733 through 74-8773.
[2] K.S.A. 2010 Supp. 74-8762(f).
[3] For the purposes of this opinion, "gaming officials" refers collectively to the Lottery Commission, the Lottery Gaming Facility Review Board, and the Kansas Racing and Gaming Commission.
[4] K.S.A. 74-8762(a)(2)(F) defines "state or local official" in relevant part as follows: "any member of the governing body of city or county where a lottery gaming facility or racetrack gaming facility is located . . ."
[5] Internal references omitted.
[6] State v. Yrigolla, 38 Kan.App.2d 1029, 1034 (2008). Emphasis in original.
[7] Activities within the scope of K.S.A. 2007 Supp. 74-8762 were determined to be: 1) the decision of the Lottery Commission in approving and executing facility management contracts with proposed lottery gaming facility managers and racetrack gaming facility managers; (2) the decision of the Review Board in selecting the lottery gaming facility management contract in each gaming zone; (3) the decision of the KRGC in approving or rejecting the lottery gaming facility management contracts selected by the Board; (4) the decision of the KRGC in approving any racetrack gaming facility management contracts approved by the Lottery Commission; (5) investigations by the Lottery Commission to examine proposals for lottery gaming facilities and racetrack gaming facilities; and (6) proceedings initiated by the Lottery Commission, the KRGC, or the executive directors of either agency to enforce the KELA and the regulations promulgated by both agencies.
[8] Pub.L. 76-252, Aug. 2, 1939, 53 Stat. 1147.
[9] E.g., Ex parte Curtis, 106 U.S. 371,372 (1882).
[10] Id. at 373.
[11] Pub L. 76-252, Aug. 2, 1939, 53 Stat. 1147.
[12] Id. at § 9.
[13] Id.
[14] 330 U.S. 75 (1947).
[15] Id. at 95.
[16] Id. at 102, 103.
[17] 413 U.S. 548, 556 (1973).
[18] Id.
[19] Id.; 330 U.S. at 100.
[20] N.J.S.A. 52:13D-12 to-27.
[21] Knight v. City of Margate, 86 N.J. 374, 385 (1981).
[22] N.J.S.A. 52-13D-17.2(g).
[23] In re Petition of Soto, 236 N.J.Super. 303, 321 (1999). Internal citations omitted.
[24] Minutes, House Federal and State Affairs Committee, March 12, 2007.
[25] Journal of the House, 528, March 23, 2007.
[26] Journal of the Senate, 606, March 28, 2007.
[27] State ex rel. Stovall v. Meneley,271 Kan. 355, 378 (2001).
[28] In re Marriage of Ross, 245 Kan. 591, 594 (1989).
[29] K.S.A. 2010 Supp. 74-8716.
[30] K.S.A. 2010 Supp. 74-8734(b).
[31] K.S.A. 2010 Supp. 74-8734(c).
[32] K.S.A. 2010 Supp. 74-8735(c).
[33] K.S.A. 2010 Supp. 74-8736(b).
[34] K.S.A. 2010 Supp. 74-8736(e).
[35] L. 2010, Ch. 136, Sec. 130, to be codified at K.S.A. 2011 Supp. 21-5905 ("Interference with the judicial process is: (1) Communicating with any judicial officer in relation to any matter which is or may be brought before such judge, magistrate, master or juror with intent improperly to influence such officer. . . .").
[36] L. 2010, Ch. 136, Sec. 165, to be codified at K.S.A. 2011 Supp. 21-6001 ("Bribery is:(1) Offering, giving or promising to give, directly or indirectly, to any person who is a public officer, candidate for public office or public employee any benefit, reward or consideration to which the person is not legally entitled with intent thereby to influence the person with respect to the performance of the person's powers or duties as a public officer or employee. . . .").
[37] K.S.A. 46-237 (" . . . no state officer or employee . . . shall accept, or agree to accept any (1) economic opportunity, gift, loan, gratuity, special discount, favor, hospitality or service . . . under circumstances where such person knows or should know that a major purpose of the donor is to influence such person in the performance of their official duties or prospective official duties. . . .").
[38] Kansas Comm'n on Civil Rights v. Howard,218 Kan. 248, Syl. ¶ 2, (1975).
[39] Wood v. Georgia, 370 U.S. 375, 395 (1962).
[40] 385 U.S. 116 (1966).
[41] Id. at 127.
[42] Id. at 135-36, 137.
[43] See, e.g., X-Men Sec., Inc. v. Pataki,196 F.3d 56, 61 (N.Y. 1999).
[44] Id. at 71.
[45] Id. at 70.
[46] See, e.g., Regan v. Time, Inc.,68 U.S. 641 (1984).
[47] K.S.A. 2010 Supp. 25-2407(a).
[48] See, e.g., Burson v. Freeman, 504 U.S. 191 (1992).
[49] 131 S.Ct. at 2346 (2011).
[50] Nev.Rev. Stat. § 281A.420(2) (2007).
[51] 131 S.Ct. at 2347-2349.
[52] Guardian Title Co. v. Bell,248 Kan. 146, 149 (1991).
[53] United States v. Salerno, 481 U.S. 745 (1987).
[54] Id. at 798.
[55] 18 U.S.C. § 700.
[56] United States v. Eichman, 496 U.S. 310 (1990).
[57] Virginia Pharmacy Bd. v. Va. Citizens Consumer Council,Inc., 425 U.S. 748, 771 (1976). Emphasis added.
[58] While the statute itself is not a content-based limit on speech, to apply it in the manner contemplated by Attorney General Opinion No. 2008-08 would be to read into it a requirement to regulate speech based on its content. To allow a public official to testify in a public hearing as a private citizen but to prohibit him or her from stating his or her identify as a public official is to read into the statute a requirement that it regulate the content of such official's speech.
[59] Boatright v. Kansas Racing Comm'n,251 Kan. 240 (1992).
[60] 59 F.3d 1058, 1072 (10th Cir. 1995).
[61] State v. Le, 260 Kan. 845, Syl. ¶ 4 (1996).